No. 18-1518

---

I**N** T**HE**
# United States Court of Appeals for the Fourth Circuit

---

T**HOMAS** K**RAKAUER**,
*Plaintiff-Appellee*,

*v.*

DISH N**ETWORK** L.L.C.,
*Defendant-Appellant*.

---

On Appeal from the United States District Court
for the Middle District of North Carolina
No. 1:14-cv-00333-CCE-JEP,
Hon. Catherine C. Eagles

---

## PUBLIC REDACTED OPENING BRIEF FOR DEFENDANT-APPELLANT DISH NETWORK LLC

---

E. Joshua Rosenkranz
Peter A. Bicks
Elyse D. Echtman
John L. Ewald
Christopher J. Cariello
O**RRICK**, H**ERRINGTON** &
　S**UTCLIFFE** LLP
51 West 52nd Street
New York, NY  10019
(212) 506-5000

Eric A. Shumsky
Kelsi Brown Corkran
Jeremy R. Peterman
O**RRICK**, H**ERRINGTON** &
　S**UTCLIFFE** LLP
1152 15th Street
Washington, DC  20005
(202) 339-8400

Paul David Meyer
O**RRICK**, H**ERRINGTON** &
　S**UTCLIFFE** LLP
405 Howard Street
San Francisco, CA  94105
(415) 773-5700

*Counsel for Defendant-Appellant*

February 19, 2019

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
## DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. 18-1518      Caption: Thomas Krakauer v. DISH Network L.L.C.

Pursuant to FRAP 26.1 and Local Rule 26.1,

DISH Network L.L.C.
(name of party/amicus)

who is _____ appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                ☑ YES ☐ NO
      If yes, identify all parent corporations, including all generations of parent corporations:
      DISH Network L.L.C. is a wholly owned subsidiary of DISH DBS Corporation, a corporation with
      publicly traded debt. DISH DBS Corporation is a wholly owned subsidiary of DISH Orbital
      Corporation. DISH Orbital Corporation is a wholly owned subsidiary of DISH Network
      Corporation, a corporation with publicly traded equity (NASDAQ: DISH).

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                              ☑ YES ☐ NO
      If yes, identify all such owners:
      Based solely on a review of Form 13D and Form 13G filings with the Securities and Exchange
      Commission, no entity owns more than 10% of DISH Network Corporation's stock other than
      JPMorgan Chase & Co. and Telluray Holdings, LLC.

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Eric A. Shumsky                        Date:        2/19/2019

Counsel for: DISH Network L.L.C.

## CERTIFICATE OF SERVICE
**************************

I certify that on        2/19/2019        the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Eric A. Shumsky                                    2/19/2019
(signature)                                            (date)

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT

TABLE OF AUTHORITIES ................................................................ iv

INTRODUCTION ..................................................................... 1

JURISDICTION ...................................................................... 4

STATEMENT OF ISSUES ......................................................... 4

STATEMENT OF THE CASE ...................................................... 5

    DISH Contracts With An Independent Company, SSN, To
    Market Satellite TV Subscriptions ......................................... 5

    SSN Defies DISH's Instructions And Calls Krakauer ................. 7

    Krakauer Sues DISH, And The Jury Ultimately Finds DISH
    Liable For SSN's Calls ........................................................ 9

    Unable To Readily Identify Class Members, The Court
    Enters An Aggregate Judgment ........................................... 12

SUMMARY OF ARGUMENT ..................................................... 13

ARGUMENT .......................................................................... 18

    I.    The Class Must Be Decertified And The Judgment
    Vacated Because The Class Is Fatally Overbroad. ............. 18

        A.    Krakauer defined the class to include numerous
        improper plaintiffs. ..................................................... 20

            1.    The class definition comprises non-
            subscribers who have no possible claim. ........... 20

            2.    The class definition comprises individuals
            who lack Article III standing. ........................... 27

        B.    The district court erred by certifying the
        overbroad class, and doubly so by not requiring
        any mechanism to weed out uninjured plaintiffs. ....... 30

            1.    Certification was improper because the
            class definition is impermissibly overbroad. ..... 30

2.    Alternatively, the class must be decertified because Krakauer identified no administratively feasible mechanism to limit recovery to proper plaintiffs. ...................... 31

3.    The district court failed to limit the judgment to those who prove liability. .............. 33

II.    The Court Failed To Instruct The Jury To Determine Whether Each Class Member Received Two Calls Within A Year ................................................................. 36

III.    No Reasonable Jury Could Find DISH Liable For The Calls Made By SSN. ................................................... 39

A.    SSN was not DISH's agent. ......................................... 40

B.    Even if SSN were DISH's agent, it exceeded its authority when it made these calls. ........................... 52

IV.    The Treble-Damages Award Must Be Overturned. ............. 57

A.    The damages must be vacated because the district court made two legal errors in applying the willful-or-knowing standard. ................................ 58

1.    The court applied the wrong legal standard when it imputed SSN's conduct to DISH. ......... 58

2.    The court applied a legally incorrect standard for willful conduct. .............................. 60

B.    The damages must be reversed because DISH did not willfully violate the TCPA as a matter of law. ...... 63

1.    DISH reasonably believed, based on its contracts with SSN and compliance measures, that it had satisfied its legal obligations. ......................................................... 64

2.    DISH did not disregard a substantial risk that SSN was placing tens of thousands of Registry calls in 2010 and 2011. ........................ 66

CONCLUSION ........................................................................ 73

ORAL ARGUMENT STATEMENT

ii

CERTIFICATE OF COMPLIANCE

ADDENDUM OF STATUTES AND REGULATIONS

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

## Cases

*The Amiable Nancy,*
  16 U.S. (3 Wheat) 546 (1818)............................................................. 58

*BMG Rights Mgmt. (US) v. Cox Commc'ns,*
  881 F.3d 293 (4th Cir. 2018)......................................................... 38, 61

*Bocek v. JGA Assocs.,*
  616 F. App'x 567 (4th Cir. 2015) ...................................................... 39

*Bosh v. Cherokee Cty. Bldg. Auth.,*
  305 P.3d 994 (Okla. 2013)................................................................. 59

*Bridgeview Health Care Ctr. v. Clark,*
  816 F.3d 935 (7th Cir. 2016)............................................................. 55

*Carlisle v. Deere & Co.,*
  576 F.3d 649 (7th Cir. 2009)............................................................. 41

*CFTC v. Gibraltar Monetary Corp.,*
  575 F.3d 1180 (11th Cir. 2009).......................................................... 43

*Charvat v. EchoStar Satellite, LLC,*
  630 F.3d 459 (6th Cir. 2010)............................................................. 64

*Charvat v. EchoStar Satellite, LLC,*
  676 F. Supp. 2d 668 (S.D. Ohio 2009) ................................................ 66

*Charvat v. NMP,*
  656 F.3d 440 (6th Cir. 2011)............................................................. 37

*Children's Broad. Corp. v. Walt Disney Co.,*
  245 F.3d 1008 (8th Cir. 2001)............................................................ 44

*Cilecek v. Inova Health Sys. Servs.,*
  115 F.3d 256 (4th Cir. 1997)............................................................. 39

iv

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ........................................................ 29

*Coston v. Plitt Theatres,*
    831 F.2d 1321 (7th Cir. 1987) ....................................... 61

*Denney v. Deutsche Bank AG,*
    443 F.3d 253 (2d Cir. 2006) ..................................... 18, 30

*Deposit Guar. Nat'l Bank v. Roper,*
    445 U.S. 326 (1980) ........................................................ 66

*Donaca v. DISH Network, LLC,*
    303 F.R.D. 390 (D. Colo. 2014) ..................................... 25

*EQT Prod. Co. v. Adair,*
    764 F.3d 347 (4th Cir. 2014) ......................................... 31

*FedEx Home Delivery v. NLRB,*
    563 F.3d 492 (D.C. Cir. 2009) ....................................... 51

*Florence Endocrine Clinic v. Arriva Med.,*
    858 F.3d 1362 (11th Cir. 2017) ..................................... 28

*General Bldg. Contractors Ass'n v. Pennsylvania,*
    458 U.S. 375 (1982) ........................................................ 40

*Global-Tech Appliances v. SEB S.A.,*
    563 U.S. 754 (2011) ........................................................ 60

*Groshek v. Time Warner Cable,*
    865 F.3d 884 (7th Cir. 2017) ......................................... 28

*Gutierrez v. Barclays Grp.,*
    2011 WL 579238 (S.D. Cal. Feb. 9, 2011) ..................... 25

*Halo Elecs. v. Pulse Elecs.,*
    136 S. Ct. 1923 (2016) ................................................... 60

*Halvorson v. Auto-Owners Ins. Co.,*
    718 F.3d 773 (8th Cir. 2013) ..................................... 27, 30

*Hoffnagle v. McDonald's Corp.*,
  522 N.W.2d 808 (Iowa 1994)................................................. 45

*Hofherr v. Dart Indus.*,
  853 F.2d 259 (4th Cir. 1988)................................................ 41

*Humphrey v. Humphrey*,
  434 F.3d 243 (4th Cir. 2006)............................................... 63

*Integrated Consulting Servs. v. LDDS Commc'ns*,
  176 F.3d 475, 1999 WL 218740 (4th Cir. 1999)............................ 44, 46

*Jones v. Royal Admin. Servs.*,
  887 F.3d 443 (9th Cir. 2018)............................................... 55

*Keating v. Peterson's Nelnet*,
  2014 WL 1891369 (N.D. Ohio May 12, 2014) ............................... 41

*Kohen v. Pac. Inv. Mgmt. Co.*,
  571 F.3d 672 (7th Cir. 2009)............................................... 30

*Kolstad v. Am. Dental Ass'n*,
  527 U.S. 526 (1999) ....................................................... 59

*Lary v. Trinity Physician Fin. & Ins. Servs.*,
  780 F.3d 1101 (11th Cir. 2015)....................................... 57, 60, 61

*Leaf Tobacco Exps. Ass'n v. Block*,
  749 F.2d 1106 (4th Cir. 1984)............................................. 21

*Leon v. Caterpillar Indus.*,
  69 F.3d 1326 (7th Cir. 1995)........................................... 49, 50

*Levy v. Receivables Performance Mgmt.*,
  972 F. Supp. 2d 409 (E.D.N.Y. 2013) .................................. 66, 68

*Lexmark Int'l v. Static Control Components*,
  572 U.S. 118 (2014) ................................................... 21, 24

*Logue v. United States*,
  412 U.S. 521 (1973) ................................................... 42, 48

*Mastrobuono v. Shearson Lehman Hutton*,
514 U.S. 52 (1995) .................................................. 45

*McCaskill v. Navient Sols.*,
178 F. Supp. 3d 1281 (M.D. Fla. 2016) ........................... 68

*McLaughlin v. Richland Shoe Co.*,
486 U.S. 128 (1988) ................................................ 60

*Messner v. Northshore Univ. HealthSystem*,
669 F.3d 802 (7th Cir. 2012) ................................. 18, 30

*Mey v. Got Warranty*,
193 F. Supp. 3d 641 (N.D. W. Va. 2016) ......................... 28

*Meyer v. Holley*,
537 U.S. 280 (2003) ...................................... 39, 42, 52

*Morgan v. U.S. Xpress*,
2018 WL 3580775 (W.D. Va. July 25, 2018) ...................... 25

*Mosser v. Fruehauf Corp.*,
940 F.2d 77 (4th Cir. 1991) .................................. 61, 62

*Murray v. New Cingular Wireless Servs.*,
523 F.3d 719 (7th Cir. 2008) .................................... 65

*New Millennium Consulting v. United HealthCare Servs.*,
695 F.3d 854 (8th Cir. 2012) .................................... 40

*In re Nexium Antitrust Litig.*,
777 F.3d 9 (1st Cir. 2015) ...................................... 31

*NLRB v. Local Union 1058*,
957 F.2d 149 (4th Cir. 1992) .................................... 44

*O'Shea v. Littleton*,
414 U.S. 488 (1974) ............................................. 29

*Old Sec. Life Ins. Co. v. Cont'l Ill. Nat'l Bank and Tr. Co.*,
740 F.2d 1384 (7th Cir. 1984) .................................. 42

*Palmetto State Med. Ctr. v. Operation Lifeline*,
    117 F.3d 142 (4th Cir. 1997)..............................................................38

*In re Peeples*,
    880 F.3d 1207 (10th Cir. 2018).................................................21, 24

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    725 F.3d 244 (D.C. Cir. 2013) ......................................................31

*RCA/Ariola Int'l v. Thomas & Grayston Co.*,
    845 F.2d 773 (8th Cir. 1988)..........................................................64

*RSM v. Herbert*,
    466 F.3d 316 (4th Cir. 2006)....................................................60, 70

*Safeco Ins. Co. of Am. v. Burr*,
    551 U.S. 47 (2007)...............................17, 57, 60, 61, 63, 64, 65, 67, 68

*Sky Angel U.S. v. Discovery Commc'ns*,
    885 F.3d 271 (4th Cir. 2018)..........................................................45

*Soehnlen v. Fleet Owners Ins. Fund*,
    844 F.3d 576 (6th Cir. 2016)..........................................................28

*Spaulding v. Wells Fargo Bank*,
    714 F.3d 769 (4th Cir. 2013)..........................................................57

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016)....................................................................28

*Standard Acc. Ins. v. Simpson*,
    64 F.2d 583 (4th Cir. 1933)................................................44, 49, 54

*State Farm Mut. Auto. Ins. v. Campbell*,
    538 U.S. 408 (2003) .......................................................................71

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009).......................................................................29

*Thomas v. Freeway Foods*,
    406 F. Supp. 2d 610 (M.D.N.C. 2005) .........................................48

*Todd v. Collecto, Inc.*,
   731 F.3d 734 (7th Cir. 2013)............................................................25

*TWA v. Thurston*,
   469 U.S. 111 (1985)...........................................................................60

*Tyson Foods v. Bouaphakeo*,
   136 S. Ct. 1036 (2016).................................................................19, 33

*United States v. Dish Network LLC*,
   256 F. Supp. 3d 810 (C.D. Ill. 2017)...............................................72

*United States v. Ellis*,
   527 F.3d 203 (1st Cir. 2008) ............................................................41

*United States v. Hilton*,
   701 F.3d 959 (4th Cir. 2012)...........................................................52

*United States v. Mouzone*,
   687 F.3d 207 (4th Cir. 2012)...........................................................38

*United States v. Poole*,
   640 F.3d 114 (4th Cir. 2011)...........................................................71

*Valley Forge Christian Coll. v. Americans United for
   Separation of Church & State*,
   454 U.S. 464 (1982)...........................................................................27

*Van Patten v. Vertical Fitness Grp.*,
   847 F.3d 1037 (9th Cir. 2017)..........................................................28

*Walewski v. Zenimax Media*,
   502 F. App'x 857 (11th Cir. 2012) ...................................................30

*Walker v. Consol. Freightways, Inc.*,
   930 F.2d 376 (4th Cir. 1991)...........................................................30

*Williams v. United States*,
   50 F.3d 299 (4th Cir. 1995).........................................................41, 48

*Wynn's Extended Care v. Bradley*,
   619 F. App'x 216 (4th Cir. 2015) .....................................................41

ix

## Statutes and Regulations

28 U.S.C. § 1291 .................................................................. 4

28 U.S.C. § 1331 .................................................................. 4

28 U.S.C. § 1332(d)(2) ......................................................... 4

47 U.S.C. § 227(b) .............................................................. 25

47 U.S.C. § 227(b)(1)(B) ..................................................... 25

47 U.S.C. § 227(b)(3) .......................................................... 24

47 U.S.C. § 227(c) ............................................... 14, 21, 22, 25

47 U.S.C. § 227(c)(1) ...................................................... 21, 23

47 U.S.C. § 227(c)(2) ...................................................... 21, 23

47 U.S.C. § 227(c)(3) .................................................. 21, 22, 23

47 U.S.C. § 227(c)(5) ............................ 4, 11, 15, 20, 22, 23, 36

47 U.S.C. § 227(c)(5)(C) ........................................... 11, 57, 66

47 C.F.R. § 64.1100(h) ....................................................... 20

47 C.F.R. § 64.1200(a)(3) ................................................... 25

47 C.F.R. § 64.1200(c)(2) ............................................. 20, 22

47 C.F.R. § 64.1200(e) (1993) .......................................... 22

47 C.F.R. § 64.1200(f)(14)(ii) ............................................. 8

## Other Authorities

28 FCC Rcd. 6574 (2013) .................................................. 65

57 Fed. Reg. 48,333 (Oct. 23, 1992) ................................... 22

68 Fed. Reg. 44,144 (July 25, 2003) ................................... 21

137 Cong. Rec. 30816 (1991) ............................................................ 22, 25

Oliver Wendell Holmes, Jr., *Agency*, 5 Harv. L. Rev. 1 (1891).............. 39

Restatement (Second) of Agency § 1 ...................................................... 46

Restatement (Second) of Torts § 284 ...................................................... 57

Restatement (Second) of Torts § 500 ...................................................... 61

Restatement (Third) of Agency § 1.01 ................................... 40, 41, 46, 48

Restatement (Third) of Agency § 1.03 ..................................................... 42

Restatement (Third) of Agency § 2.02 ........................................ 42, 52, 54

Restatement (Third) of Agency § 3.01 ..................................................... 41

Restatement (Third) of Agency § 7.04 ...................................................... 59

## INTRODUCTION

In this upside-down case, the wrong plaintiffs recovered from the wrong defendant.

Start with the plaintiffs.  Thomas Krakauer brought this case as a class action, alleging that DISH violated the Do Not Call provisions of the Telephone Consumer Protection Act (TCPA).  Ultimately, the court entered aggregate judgment for more than 18,000 claimants, to the tune of over $60 million:  $1,200 for each time an independent retailer (not DISH) called a number that someone placed on the National Do Not Call Registry.

So who were these lucky class members?  That's the first problem. Krakauer didn't limit his class to telephone subscribers, the people protected by the TCPA.  Nor to people who actually received calls or somehow were harmed.  The court certified a class of anyone "associated with" a phone number called by the retailer, Satellite Systems Network (SSN).  That impermissibly broad class definition encompasses au pairs, former boyfriends, and children who have long since moved away—indeed, potentially anyone ever linked to the phone number.  And the court never required Krakauer to prove that

whichever person claimed damages ever received a call. By definition, therefore, the class includes plaintiffs with no cause of action.

Worse still, it shouldn't have been DISH in the dock. DISH didn't make the calls. Every call was made by SSN. SSN isn't DISH's alias or an alter ego. It is one of thousands of independent retailers, like RadioShack, that market DISH's satellite TV subscriptions. Year after year, DISH and SSN signed contracts specifying that SSN is an independent contractor and limiting SSN's authority. SSN ran its own business, using its own marketing expertise, subject only to contractual standards and quality control from DISH—including numerous reminders of SSN's contractual obligation to follow telemarketing laws. It was SSN that decided to make each of the calls, based on sales leads that SSN purchased—just like it did working for other companies, including DISH's biggest competitor.

DISH isn't legally responsible for the actions of a rogue contractor. Every authority, from the Restatements to the Supreme Court, makes this clear. And at a bare minimum, DISH's reasonable understanding that SSN was an independent contractor forecloses the decision to treble damages to $60 million.

So how did this happen?  Because the court accepted Krakauer's repeated refrain that DISH simply had to be punished.  Krakauer urged the court to ignore niceties:  There "is a telephone number that is on the [Do Not Call] registry, and there was a call placed by SSN, … and the call was connected….  DISH should not benefit from the fact that *we can't find out who that person is right now*."  JA255 (emphasis added).  The court acknowledged that the jury never "determine[d] the identity of the persons who received the calls."  JA619.  But it was single-mindedly focused on deterring DISH—even if that meant holding DISH liable "for damages owed to injured class members *who cannot be found*."  JA636 (emphasis added).

The proper solution was for the court to correctly define the class, and for Krakauer to sue the party that made the calls.  As he did below, Krakauer will paint DISH as a bad actor that simply must be punished.  But even if his accusations were true—and DISH vehemently disputes them—they provide no legal justification for the shortcuts taken here.  The class should be decertified, and the judgment vacated or reversed.

## JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and

1332(d)(2).  On April 5, 2018, the court entered judgment, JA687-88,

thereby implicating 28 U.S.C. § 1291.  DISH filed a timely notice of

appeal.  JA704-05.

## STATEMENT OF ISSUES

1.  Section 227(c)(5) of the TCPA creates a private right of action

for telephone subscribers.  Article III of the U.S. Constitution requires

that a plaintiff suffered concrete injury to have standing.  Did the court

err by failing to limit the class definition to phone subscribers; by failing

to limit the class definition to people who suffered concrete injury; and

by failing to require Krakauer to ultimately prove that class members

were harmed?

2.  To recover under § 227(c)(5), a single person must receive two

calls within a year.  Did the court incorrectly instruct the jury on this

element?

3.  The contract between DISH and SSN expressly disclaimed an

agency relationship and barred SSN from violating telemarketing laws.

DISH also instructed SSN to follow Do Not Call laws generally, and not

4

to call Krakauer specifically.  Did the court err in holding DISH

responsible for SSN's calls on the theory that SSN was DISH's agent?

And even if SSN were DISH's agent, did the court err in holding that

SSN's unlawful calls fell within the scope of any agency relationship?

4.  The TCPA authorizes treble damages only when the defendant

knowingly or willfully violated the statute.  Did the district court

misinterpret the legal standard for knowing or willful conduct, and err

as a matter of law in determining that DISH's conduct met that

standard?

## STATEMENT OF THE CASE

### *DISH Contracts With An Independent Company, SSN, To Market Satellite TV Subscriptions*

DISH is one of the largest pay-television providers in the country.

To help market its satellite TV subscription service, DISH contracts

with thousands of independent retailers.  JA477-78.  SSN was one such

retailer.  JA764, 355, 364, 368.  DISH's contracts with retailers contain

standards and guidelines for how retailers should market DISH's

products.  *See* JA764, 769, 772-74, 780-81 (retailer agreement).  But the

retailers operate independently:  They maintain their own offices, hire

their own employees, create their own marketing strategies (e.g., TV,

5

radio, print, telemarketing, etc.), and even market DISH's competitors. *See* JA366-70, 764. Thus, SSN's contract specified in bold, capital letters that it was an "**INDEPENDENT CONTRACTOR**" that would "market, promote and solicit [DISH] orders" on a "non-exclusive basis." JA764, 784. Engaging independent contractors is common, it's lawful, and it's good business: It allows one company to leverage other companies' specialized skills and greater efficiency.

DISH works to ensure that its contractors comply with the law, among other reasons, because telemarketing violations damage DISH's business and brand. JA1048 (compliance letter to SSN); JA492-95, 412, 446. Thus, the contract between DISH and SSN required SSN to comply with the law, and made SSN "solely responsible" for doing so. JA781. DISH also has a compliance program with dedicated employees who remind retailers of their legal obligations, and who address consumer complaints. JA417-19, 440-42, 490-92, 966-67, 968-71, 1048, 972-77.

From 2006 to May 2010—the four years preceding the class period—SSN made millions of calls marketing DISH services. JA408. Yet DISH received only five complaints from those calls claiming that

6

SSN called someone whose phone number was on the National Do Not Call Registry. JA409, 1048(Krakauer), 1020(Fisher), 1018(Mitchell), 1016(Payne), 1028(Campbell) (DISH's responses to complaints).

As DISH's compliance manager explained, a number that low indicates a retailer is generally "following the letter of the law." JA422-23, 436-37. It suggests isolated "human error" and "innocent" mistakes rather than systemic disregard of the Do Not Call Registry. JA424. DISH investigated each complaint, instructed SSN to add the complaining individual to SSN's internal Do Not Call list, and reiterated that SSN must comply with telemarketing laws. *See, e.g.*, JA1020(Fisher).

### *SSN Defies DISH's Instructions And Calls Krakauer*

One of the five complaints concerned a call to Thomas Krakauer. In 2003, Krakauer had ordered DirecTV service from SSN. JA978, 324. By 2009, SSN no longer marketed DirecTV services, and it called Krakauer to persuade him to switch to DISH. In the interim, however, Krakauer had put his phone number on the Registry. JA315-18.

Krakauer complained to DISH, and DISH promptly investigated. Its investigation revealed SSN had made the call. JA1036. So DISH

notified SSN and requested details about SSN's conduct—including how SSN obtained the number, and when SSN had last "scrubbed" its call list to remove numbers on the Registry. JA1048. DISH instructed SSN to "immediately ensure that [Krakauer's] phone number has been added to" SSN's internal list of numbers not to call. And DISH warned SSN that "[a]dditional incidences of this nature may result in disciplinary action up to and including termination of your Retailer Agreement." JA1048; *see* JA429-32.

SSN responded the very next day with a reasonable explanation: It believed Krakauer's prior purchase of DirecTV service created an "Established Business Relationship" (EBR) with him. JA1045, 434. When an EBR exists, a marketer may call a number on the Registry. 47 C.F.R. § 64.1200(f)(14)(ii). SSN also said it took corrective action: It reviewed the incident with a sales manager and added Krakauer's number to its internal Do Not Call list. JA1045-46, 432-34. And it reiterated to DISH that "[w]e always comply with National Do Not Call Policies and ... take Do Not Call violations very seriously." JA1046. SSN said it wouldn't call Krakauer again. JA1045-46. DISH then reported to Krakauer what it had found. JA327.

8

Unbeknownst to DISH, however, SSN ignored DISH and repeatedly called Krakauer from May 2010 to August 2011. JA462-63. It turned out SSN had been secretly flouting the Registry, and the calls to Krakauer were just the start. From May 2010 to August 2011, SSN made thousands of calls to numbers on the Registry. JA671. Although SSN had placed more than 1.6 million calls during the class period to offer DISH services, JA151, DISH didn't receive a single complaint from an SSN call recipient based on those calls, JA451, including from Krakauer, JA327-28, 331.

### *Krakauer Sues DISH, And The Jury Ultimately Finds DISH Liable For SSN's Calls*

In April 2014, Krakauer sued DISH (not SSN) under the TCPA. He purported to represent a class of "[a]ll persons … whose telephone numbers were listed on the [Registry] for at least 30 days, but who received telemarketing calls from [SSN], to promote [DISH] from May 1, 2010 to August 1, 2011." JA80.[1]

---

[1] Krakauer also was a featured witness in *United States v. DISH Network L.L.C.*, a telemarketing enforcement action brought by the United States and four states. No. 09-cv-3073 (C.D. Ill.). The verdict favoring plaintiffs in that case is on appeal to the Seventh Circuit, No. 17-3111.

At class certification, Krakauer's expert relied on SSN call records to identify what she said were more than 50,000 calls to residential landlines made by SSN during the class period to some 20,000 phone numbers on the Registry. JA119-20. DISH opposed certification, arguing that the class went beyond the relevant group of people—phone subscribers. Indeed, Krakauer didn't even have subscriber information: The records reflecting the numbers called by SSN didn't identify subscribers (and Krakauer never sought discovery to identify them). *See* JA93-95. Krakauer instead relied on private databases that reflected any name—often multiple names—"associated with" phone numbers that SSN called. JA98. But those databases didn't even show whether the named individuals used the number at the time the calls were made, much less whether they actually *received* telemarketing calls from SSN. JA132-33. The court nevertheless certified the class. JA170-203.

Two key issues dogged the ensuing trial.

*First*, Krakauer had to prove that SSN was acting as DISH's agent when it made the calls. JA513-17 (jury instructions). Thus, he had to overcome, among other things, the language in the DISH/SSN Retailer

10

Agreements, and DISH's express instructions not to call Krakauer and other registered numbers. *Second*, Krakauer had to prove that each class member "received more than one telephone call within any 12-month period." 47 U.S.C. § 227(c)(5). But Krakauer offered no evidence that any class members (other than himself) were telephone subscribers or personally received telemarketing calls during the class period. The court deemed such evidence unnecessary. It "remove[d] from the upcoming trial" the question of who received the calls. JA274.

The jury ultimately awarded $400 for each call placed by SSN to the still-unidentified class members. JA508-09. That amounted to some $20 million, which the district court then tripled. Treble damages are available only for willful or knowing violations of the TCPA. 47 U.S.C. § 227(c)(5)(C). The court made that finding after concluding that SSN's conduct could be imputed to DISH, and that DISH should have known of TCPA violations that SSN committed before the class period. JA571. On that basis, the court increased damages to $1,200 for each phone call. JA576-79. Because a statutory violation requires a plaintiff to have received two calls, the court awarded each plaintiff at least $2,400—with many set to receive $10,000 and up. JA993.

11

### *Unable To Readily Identify Class Members, The Court Enters An Aggregate Judgment*

Notwithstanding the verdict, the class members still had not been identified. Neither the jury nor the court had determined who received the calls, much less whether they were subscribers. For that reason, the court initially declined to enter judgment. JA625-27. It acknowledged that DISH had not had an opportunity to litigate whether identifiable people received the calls, and found that "[a]s a matter of fairness and 'basic due process,'" DISH was entitled to do so. JA626. The court decided to leave those determinations to "some sort of claims process." JA265-66; *see* JA262-64, 244, 523. DISH believed no post-trial process could cure the errors from class certification and trial, but nonetheless proposed that each claimant complete a form and submit evidence that they were a subscriber or actually received two or more calls. JA538-39, 542.

The court denied DISH's request, then (notwithstanding its prior ruling) started the process of entering judgment while the claims process was ongoing. It concluded that approximately 11,000 class members were adequately identified in Krakauer's records—the same records that only identified individuals "associated with" numbers—and

precluded DISH from challenging whether those people had a valid claim. JA671 ("[T]he identities of these class members are not reasonably subject to dispute."). DISH would not be permitted to challenge whether a named individual was the phone-line subscriber, actually received the calls, or even was in the household of someone who received them. Nor could DISH challenge whether the phone number had changed hands. The identities of the remaining 7,000 class members would be established through claim forms, JA682, 698, but the court's form did not ask the claimant to identify the telephone subscriber, or who answered any call. JA643. The court then entered an aggregate class judgment. JA685.

## SUMMARY OF ARGUMENT

I.    A court may not certify a class when the class definition includes people who cannot have a valid claim, including because they have no standing. And even when the court has properly granted certification, the plaintiff must identify a way to ensure that only those with valid claims recover. The district court certified a class that violated these basic rules.

13

A.    The class was overbroad in two ways.

1.    The court certified a class that includes non-subscribers.  Non-subscribers, however, are categorically unable to state a claim under § 227(c).  The text and structure of the TCPA make clear that only subscribers fall within the zone of interests Congress sought to protect.  It is subscribers who have rights to telephone numbers, and subscribers who are authorized to say they don't want to "receive" calls by placing their numbers on the Registry.  The district court erroneously certified a much broader class that includes anyone "associated with" a phone number called by SSN.

2.    This "associated with" class also includes people who lack standing.  To satisfy Article III, a plaintiff must have suffered actual or threatened injury.  The class definition, however, does not require that a class member be a subscriber, answer a phone call, hear the phone ring, or even live at the residence to which a call was placed.  Such people suffer no conceivable injury.

B.    Because the class definition includes categories of plaintiffs with no conceivable claim, the class must be decertified and the judgment vacated.

1.    It is impermissible to certify a class defined to include a significant number of people who *could not* recover—whether because they lack a valid claim or lack standing to bring one.

2.    It also is impermissible to certify a class unless the plaintiff identifies an administratively feasible mechanism to demonstrate, with common proof, which plaintiffs have a right to recover.  Krakauer never explained how he would show who is a subscriber or was otherwise injured by a violation.

3.    And, in fact, he never did so.  Even a properly certified class cannot recover unless the court ensures that each plaintiff established liability.  Here, however, the court allowed Krakauer to proceed through trial and claims administration without ever showing that any class member was a subscriber or actual call recipient.

II.    Next, the judgment must be vacated because the court improperly instructed the jury on § 227(c)(5)'s requirement that each plaintiff "received more than one telephone call" within a year.  That element requires proof that *each person* received at least two calls.  The court, however, instructed the jury that it need only find SSN made two calls *to the same number*.  But numbers commonly change hands, so two

15

calls to a number is not the same thing as two calls received by a single person.

III.    Alternatively, the verdict must be reversed outright because DISH is not liable for SSN's actions.  DISH cannot be liable unless (a) SSN possessed actual authority to act as DISH's agent; and (b) SSN's telemarketing violations fell within the scope of that actual authority.

A.    For actual authority to exist, both parties must assent to an agency relationship, and the principal must control the agent.  Here, the written agreements between DISH and SSN expressly rejected any agency relationship.  DISH repeatedly reminded SSN it was not an agent.  And the court acknowledged that DISH did not have day-to-day control over SSN's operations.

B.    Even if there were an agency relationship, no reasonable jury could find SSN acted within the scope of any authority it had. DISH repeatedly and unambiguously instructed SSN not to call Krakauer, and to comply with telemarketing laws.  To uphold the verdict, the district court pointed to generalized evidence that (the court thought) suggested employees in DISH's compliance department failed

16

to adequately supervise SSN. But failing to supervise someone doesn't establish control over them—if anything, it shows a *lack* of control. And certainly it does not constitute authorization to *violate* the law, especially in the face of unambiguous instructions to *comply with* the law.

IV.    Last, the treble-damages award cannot stand.

A.    The district court's trebling decision rests on two legal errors. First, the court mistakenly believed SSN's conduct could be "imputed to DISH." But a principal is liable only for compensatory, not enhanced, damages based solely on the conduct of the supposed agent.

Second, the court erred when it looked to DISH's own conduct. It applied a watered-down negligence standard rather than the demanding willfulness standard mandated by the Supreme Court—i.e., knowing disregard of a risk "substantially greater than that which is necessary to make … conduct negligent." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68-69 (2007).

B.    Under the proper standard, DISH did not act willfully as a matter of law. Even when a defendant's conduct is ultimately determined to be illegal, it is not *willful* if it is consistent with an

objectively reasonable understanding of the law. And during the class period, no case, agency pronouncement, or regulation indicated that a company is liable under the TCPA for calls it neither placed nor specifically directed an agent to place. Moreover, DISH had ample basis to believe that SSN was its independent contractor, not its agent.

Furthermore, for the full range of violations to be willful, DISH would have had to know that SSN posed an unjustifiably high risk of committing *all* of them. Yet DISH did not receive a single complaint from an SSN call recipient based on calls SSN made during the class period. And the handful of complaints DISH received based on calls in the years before the class period do not establish DISH's willfulness during the class period, let alone with respect to over 51,000 calls.

## ARGUMENT

## I.  The Class Must Be Decertified And The Judgment Vacated Because The Class Is Fatally Overbroad.

Class actions can be complicated, but they have some basic ground rules. Foremost among them is that a class cannot be defined to include people who could not recover. A class "defined so broadly as to include a great number of members who for some reason could not have been harmed … is defined too broadly to permit certification." *Messner v.*

18

*Northshore Univ. HealthSystem*, 669 F.3d 802, 824-25 (7th Cir. 2012); *see Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006) (a class cannot be "defined in such a way" that it necessarily embraces people who "lack standing"). And an award in a class action "cannot stand" if "there is no way to ensure that [the] damages award goes only to injured class members." *Tyson Foods v. Bouaphakeo*, 136 S. Ct. 1036, 1053 (2016) (Roberts, C.J., concurring).

The court certified a TCPA class of unprecedented breadth—one that included anyone merely "associated with" a phone number called by SSN that is on the Registry. JA180. This definition encompassed thousands of improper plaintiffs who could not possibly state a claim, *infra* § I.A.1, and who lack the actual injury required for Article III standing, *infra* § I.A.2. The resulting class violated the foundational rules set forth above. And even if such a class could be certified, the court never required Krakauer to demonstrate that each putative plaintiff established liability. *Infra* § I.B. Accordingly, the judgment must be vacated and the class decertified.

We begin with the two errors in the composition of the class, then turn to the reasons they require decertification and vacatur.

### A. Krakauer defined the class to include numerous improper plaintiffs.

The TCPA creates a private right of action that may be brought by a "telephone subscriber"—the individual who is "responsible for payment of the telephone bill," 47 C.F.R. § 64.1100(h), and therefore has a statutory right to object to telemarketing calls, *see* 47 C.F.R. § 64.1200(c)(2). The district court certified a much broader class: people called by SSN who were "associated with" a phone number on the Registry. JA180. This class is defined to encompass not just subscribers, but people with no conceivable claim—for instance, au pairs, former boyfriends, and children who have grown up and moved out. It also encompasses people who suffered no concrete injury—who weren't subscribers, didn't answer the phone, or didn't even hear it ring—and therefore lack standing.

### 1. The class definition comprises non-subscribers who have no possible claim.

**a.** Under the TCPA, "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may" bring suit. 47 U.S.C. § 227(c)(5). But not just anyone can sue; "a

20

statutory cause of action extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Lexmark Int'l v. Static Control Components*, 572 U.S. 118, 129 (2014). Thus, a court must ask "whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id.* at 127; *see also Leaf Tobacco Exps. Ass'n v. Block*, 749 F.2d 1106, 1111 (4th Cir. 1984); *In re Peeples*, 880 F.3d 1207, 1213 (10th Cir. 2018).

Here, Congress protected the interests of telephone subscribers who wanted to avoid telemarketing calls. Section 227(c)'s very title is "Protection of *subscriber* privacy rights." (emphasis added). Its first sentence instructs the FCC to prescribe regulations "to protect *residential telephone subscribers'* privacy rights to avoid receiving telephone solicitations to which they object." *Id.* § 227(c)(1) (emphasis added); *accord id.* § 227(c)(2). And the Do Not Call Registry is defined as a "database to compile a list of telephone numbers *of residential subscribers who object to receiving telephone solicitations.*" *Id.* § 227(c)(3) (emphasis added); *see* 68 Fed. Reg. 44,144, 44,144 (July 25, 2003) ("The TCPA requires the [FCC] to protect residential telephone

subscribers' privacy rights to avoid receiving telephone solicitations to which they object.").

Congress tied the cause of action to those same subscribers. A claim under § 227(c)(5) requires an underlying "violation of the regulations prescribed under this subsection." And the relevant regulation concerns subscribers; it is subscribers who can place their numbers on the Registry, and the regulation prohibits calls to a "residential telephone subscriber who has registered his or her telephone number" on the Registry. 47 C.F.R. § 64.1200(c)(2). Indeed, even before the Registry was created, the regulation allowed only a "subscriber" to object to receiving calls by placing their number on companies' internal Do Not Call lists. *Id.* § 64.1200(e) (1993); 57 Fed. Reg. 48,333, 48,333, 48,335-36 (Oct. 23, 1992).

Section 227(c) thus makes clear the injury it seeks to redress: not every last person's mere annoyance at receiving a telemarketing call, but the particular injury that results when unwanted telemarketing calls are made to "residential subscribers who object to receiving telephone solicitations," § 227(c)(3)—i.e., the harm to someone who "affirmatively [took] action to prevent such calls," 137 Cong. Rec. 30818

(1991) (statement of Sen. Pressler, sponsor of the bill). Others who merely answer calls—a subscriber's son visiting from college, or a houseguest—are not injured in the relevant way and have no claim based on calls to the subscriber's number.

A contrary interpretation would work great mischief, creating multiple claimants for each telemarketing violation. This could create a race to judgment among eligible plaintiffs and risk double recovery against the defendant. Congress could not have intended this result.

**b.** The district court, however, concluded that § 227(c)(5) is "not limit[ed] … to only subscribers." JA182. It certified a class that encompassed any person "associated with" a phone number on the Registry. JA180. The court made clear that, under its "associated with" standard, non-subscribers may recover. JA182. It reasoned that while § 227(c)(1)-(3) all pertain to "allowing subscribers to register their numbers," JA181, § 227(c)(5) does not refer explicitly to subscribers but rather "[a] person who has received" calls, JA182.

This reasoning cannot be squared with the statutory text, which states that the "person" must suffer a "violation of the regulations prescribed under this subsection." As explained above (at 23), from

23

their inception the implementing regulations have concerned the rights of "subscribers" who object to calls by placing their names on a Registry.

*Lexmark* also refutes the district court's reliance on the statutory term "person." The plaintiff in *Lexmark* sought to sue under the Lanham Act for false advertising, alleging that a misleading ad duped her into purchasing a disappointing product. 572 U.S. at 122-23. Much like here, the statute provided that "*any person* who believes that he or she is likely to be damaged" could sue. *Id.* at 129 (emphasis added). "Read literally, that broad language might suggest that an action is available to anyone …." *Id.* Even so, the Court explained, the claim is available only to those Congress intended to protect—individuals suffering commercial harm to their reputation or sales. *Id.* at 131-32; *see Peeples*, 880 F.3d at 1215-16. And here, Congress intended to protect the subscriber whose desire to avoid telemarketing calls was ignored.

The district court also relied on cases interpreting a different provision, § 227(b)(3). That section creates a cause of action for "robocalls," and some district courts have thought it available to any robocall recipient. JA181-82 (citing cases). But "each provision of the

24

[statute] must be analyzed individually to determine who falls within the scope of its protection." *Todd v. Collecto, Inc.*, 731 F.3d 734, 738 (7th Cir. 2013); *see Morgan v. U.S. Xpress*, 2018 WL 3580775, at *3 (W.D. Va. July 25, 2018).  And § 227(b) is meaningfully different from § 227(c).  It covers any robocall to any "residential telephone line"; makes no reference to residential subscribers or the Registry; and doesn't require an individual to act to stop receiving robocalls.  *Id.* § 227(b)(1)(B); 47 C.F.R. § 64.1200(a)(3).  Section 227(b) was enacted through separate legislation and addresses a "different harm[]" governed by "a different set of rules."  *Donaca v. DISH Network, LLC*, 303 F.R.D. 390, 399 (D. Colo. 2014); *see* 137 Cong. Rec. 30822 (1991) (Sen. Hollings).  Whatever one concludes about § 227(b)—and even there, authorities are divided[2]—it sheds little light on § 227(c).

**c.**  The court's "associated with" class necessarily included numerous non-subscribers.  This is for the simple reason that multiple people often are "associated with" a phone number.

---

[2] *Compare Gutierrez v. Barclays Grp.*, 2011 WL 579238, at *5 (S.D. Cal. Feb. 9, 2011) ("[T]he TCPA is intended to protect the telephone subscriber, and thus it is the subscriber who has standing to sue for violations of the TCPA.").

The district court based class membership, in part, on records from a vendor, Five9, which provided telemarketing software to SSN. JA614, 1024-27.  But those records don't show whether a person was the subscriber.  JA138-39, 179-81, 675, 682, 1024-27.  And many of the numbers in those records are "associated with multiple names"—only one of which could be the subscriber.  JA140 (DISH expert Aron).

When the Five9 data didn't supply a name, the court relied on a LexisNexis database—which also doesn't identify subscribers, as LexisNexis itself confirmed.  JA142; *see* JA138 (DISH expert Aron). Any given record may come from "thousands of [different] sources," including credit card applications, utilities, and even warranties. JA113&n.2.  Simply put:  Whenever a subscriber's ex-girlfriend, former roommate, au pair, or child previously filled out a credit-card application on which they listed the subscriber's phone number (because they lived under that roof at the time), and that association was captured in this database, each person would be "associated with" the number.  The same even would be true of a *former* subscriber.  But none would be the subscriber—the person with a statutory right to bring suit.

And for thousands of other numbers SSN called, *anyone* could attempt to self-verify their "association with" the number using a website (www.dishclassaction.com), without showing they were the subscriber. Even Krakauer's class notice didn't require confirmation that the person was the subscriber. JA205-06.

The class definition encompasses numerous people who have no statutory claim.

>    **2.    The class definition comprises individuals who lack Article III standing.**

Even if the TCPA did permit anyone "associated with" a phone number to sue, the broad class certified here runs afoul of Article III because it includes people who suffered no concrete injury.

"[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State*, 454 U.S. 464, 472 (1982). This fundamental principle holds equally true in class actions. *E.g.*, *Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 778-79 (8th Cir. 2013). And it "requires a concrete injury even in the context of a statutory

27

violation." *Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576, 582 (6th Cir. 2016) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016)). That is because the fact of a statutory violation does not necessarily establish actual injury. *Id.*; *Groshek v. Time Warner Cable*, 865 F.3d 884, 887 (7th Cir. 2017), *cert. denied*, 138 S. Ct. 740 (2018).

In the TCPA context, therefore, courts have examined whether plaintiffs were injured in some concrete way—for instance, because they were unable to use a phone line tied up by a telemarketing solicitation, *Mey v. Got Warranty*, 193 F. Supp. 3d 641, 645 (N.D. W. Va. 2016); because of "aggravation" caused by an intrusion on privacy, *Van Patten v. Vertical Fitness Grp.*, 847 F.3d 1037, 1041 (9th Cir. 2017); or, as under the TCPA's junk fax provisions, because they incurred actual costs, *Florence Endocrine Clinic v. Arriva Med.*, 858 F.3d 1362, 1366 (11th Cir. 2017). Those inquiries make good sense; trees falling in forests might make sounds, but a phone ringing in an empty house creates no injury.

Krakauer made no such showing here. The court acknowledged that members of the certified class "did not necessarily pick up or hear ringing every call at issue in this case." JA249. Yet the court found

28

standing based on some *past* "*risk* of an injury to privacy." JA249 (emphasis added). That was legal error. "Risk of injury" can sometimes establish standing when a plaintiff complains of threatened *future* harm. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (requiring a non-speculative "risk" of injury that is "certainly impending"); *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) ("It must be alleged that the plaintiff has sustained or is immediately in danger of sustaining some direct injury."). But when a plaintiff seeks relief for alleged *past* harm, the "risk" that such harm might have happened is irrelevant. It amounts to saying, "I could have been hurt (even though I wasn't)." If the harm didn't occur, there's no injury. *See generally Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) ("Standing … is not an ingenious academic exercise in the conceivable but requires a factual showing of perceptible harm."). The court's contrary rule would nullify the requirement of injury in fact.

**B.    The district court erred by certifying the overbroad class, and doubly so by not requiring any mechanism to weed out uninjured plaintiffs.**

**1.    Certification was improper because the class definition is impermissibly overbroad.**

A court cannot certify a class defined to include putative members who are categorically ineligible to recover.  *Supra* 18-19; *Messner*, 669 F.3d at 824-25; *see Walker v. Consol. Freightways, Inc.*, 930 F.2d 376, 382 (4th Cir. 1991) (class cannot be certified when it includes individuals who have no claim and "lack standing to sue").

The district court did just that.  By definition, a class that includes non-subscribers "impermissibly includes members who have no cause of action as a matter of law." *Walewski v. Zenimax Media*, 502 F. App'x 857, 861 (11th Cir. 2012) (unpublished).  And by certifying a class of everyone "associated with" a phone number, the court "defined [the class] in such a way" that it includes members who necessarily "suffered no injury and lack standing." *Denney*, 443 F.3d at 264; *see Halvorson*, 718 F.3d at 778-79; *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009) (improper to certify a class "if the definition is so broad that it sweeps within it persons who could not have been injured by the

defendant's conduct"). The class must therefore be decertified and the judgment vacated.

> ### 2. Alternatively, the class must be decertified because Krakauer identified no administratively feasible mechanism to limit recovery to proper plaintiffs.

Even when certification is not *categorically* impermissible because the class includes people who *cannot* have a claim, certification remains inappropriate unless a plaintiff "show[s] that [he] can prove, through common evidence, that all class members were in fact injured." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013). The plaintiff must identify a mechanism for excluding uninjured class members that is "administratively feasible" and "protective of defendants' Seventh Amendment and due process rights." *In re Nexium Antitrust Litig.*, 777 F.3d 9, 19 (1st Cir. 2015). In short, it must be "administratively feasible for the court to determine whether a particular individual is a member." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014).

Krakauer didn't even try to identify an administratively feasible, classwide mechanism to separate subscribers from non-subscribers, and to limit the class to those suffering injury. All he sought to prove was

that SSN called certain *numbers*, not that any apparent class member was the affected subscriber, much less received calls or somehow suffered harm. His case was built on internal SSN records of unknown provenance—specifically, lists of SSN's sales leads, which therefore just reflected whom SSN *wanted* to call. He narrowed those lists to numbers on the Do Not Call Registry. Where the records listed no names, he cross-referenced numbers against records in commercial databases (like LexisNexis) that purport to match people with phone numbers. JA675; *supra* 26.

But those databases can't be an administratively feasible way to identify subscribers—for the simple reason that, as described above (at 26), they don't identify subscribers. Each record could come from "thousands of [different] sources," like credit card applications, utilities, or warranties. *See* JA113&n.2. And certainly Krakauer had no mechanism to establish—much less on a classwide basis—that anyone was injured. These lists of people "associated with" phone numbers didn't show who picked up the phone, who was home when the phone rang, or even that any given class member still lived at the residence at the time of the call. *Supra* 26-28. Krakauer never intended to prove

32

any of this, let alone by an administratively feasible, classwide mechanism.

### 3. The district court failed to limit the judgment to those who prove liability.

Finally, even when a class has been properly certified, there must be some "way to ensure that the jury's damages award goes only to injured class members." *Tyson Foods*, 136 S. Ct. at 1053 (Roberts, C.J., concurring); *id.* at 1050 (opinion for the Court) (the question "whether uninjured class members may recover is one of great importance"). But, just like at certification—where Krakauer failed to identify a *mechanism* for using common proof to limit recovery to proper plaintiffs—at trial Krakauer never actually showed who was a proper plaintiff. He never showed that any class member (other than himself) was a subscriber, answered a phone call, heard the phone ring, or was otherwise injured. And the jury made no such finding. JA513 (jury instructions).

Instead, the court instructed the jury that it could enter judgment if it found that "SSN made at least two solicitation calls *to those numbers*." JA518 (emphasis added), 519 ("Dr. Krakauer does not have to prove here whether names or addresses match up with phone

numbers.… Krakauer must prove … that … SSN called the number at least twice during any 12-month period."). But showing two calls to a given phone number doesn't weed out valid from invalid claims. Imagine two calls to the Doe household; John Doe (the subscriber) answered the first and Jane Doe (home from college) answered the second. The jury would have had no idea—all it would know is that two calls were made to a given number. But the instructions nonetheless authorized it to enter judgment for anyone associated with that phone number—regardless whether John, Jane, or au pair Paula Poe submitted the claim. And if John Doe moved mid-year and Tim Toe subscribed to that number, the jury would have no way to assess who the subscriber was at the time the calls were received.

Having permitted Krakauer to proceed through trial without establishing that any absent class member was injured—or even received the calls—the court's post-trial process allowed those individuals to receive thousands of dollars. The court began by purporting to resolve the identities of approximately 11,000 class members based solely on the fact that Krakauer's records mentioned their name. JA671. But these were the same records that merely

showed the names of individuals "associated with" phone numbers. *Supra* 26-27, 31-33. The court did not require these individuals to attest they were the subscriber or actually received the calls. JA628, 671, 673.

Worse still, Krakauer's records showed numerous phone numbers with disparate associated names. JA546-47, 985-91. For instance:

- For the phone number ████████████, the court awarded $21,600 to ████████████, even though LexisNexis shows ████████████ associated with the number. JA995**.**

- For the phone number ████████████, the court awarded $7,200 to ████████████████, even though LexisNexis shows ████████████ associated with the number. Moreover, ████████ is the individual associated with the number *during* the class period, while ████████ is associated with the number almost two years *after* the class period. JA989

The court refused to consider the conflicting evidence. JA672-73.

For the remaining approximately 7,000 class members, the court did require a claim form. But that form asked only whether "you or someone in your household ha[d] this telephone number" during the class period. JA643. It did not ask the claimant to identify who in the household had the number, or who answered any call. *See* JA643. It did not ask the claimant to state that the household had the number

35

during the entire period, or even at the time the calls were made. It thereby allowed a claim from anyone who lived in a household with someone who had the phone number at some point during the class period.

The result: The court allowed the jury to find in favor of over 18,000 claimants—and award tens of millions of dollars—without finding that a single identifiable individual other than Krakauer was a telephone subscriber or had Article III standing. Although some absent class members presumably were subscribers during the class period, and could have been part of some properly constituted class, the class was not so limited, and the evidence didn't show this. The judgment must be overturned.

## II. The Court Failed To Instruct The Jury To Determine Whether Each Class Member Received Two Calls Within A Year.

Next, the judgment must be vacated because the court improperly instructed the jury. Under the TCPA, a plaintiff must prove she "received more than one telephone call within any 12-month period." 47 U.S.C. § 227(c)(5). So there must be (1) a relevant "person" who (2) "received more than one telephone call" (3) "within any 12-month

36

period." *Charvat v. NMP*, 656 F.3d 440, 449 (6th Cir. 2011) (describing this "threshold requirement"). In an individual action, a plaintiff might use a phone bill to show that she was the subscriber, and call records or testimony to show she received two calls within a year.

The court, however, instructed the jury very differently. Over DISH's objection, the court "remove[d] from the … trial any issues as to whether a particular phone number is associated with a particular person." JA274 *see also* JA292-93, 506. Thus, liability could be established if SSN merely called the same *number* twice, regardless of whether a single *person* received both calls. The court repeatedly told the jury that its "job is to decide … whether SSN made at least two solicitation calls *to those numbers*." JA518 (emphasis added); *see also* JA519 ("Dr. Krakauer does not have to prove here whether names or addresses match up with phone numbers.… Krakauer must prove … that … SSN called the number at least twice during any 12-month period"), JA517.

The problem is simple: Two calls to the same number is not the same thing as two calls received by the same person. That's because, among other reasons, phone numbers change hands. A call placed to a

37

number in January wouldn't be received by the same person as a call placed to that number in October if the original recipient moved or canceled their landline. And the problem is compounded by the court's "associated with" class, which allows multiple people to submit claims for calls to a single number, without proof that an identified person received both calls. *Supra* 33-36.

This legally erroneous jury instruction, which the court reviews de novo, *United States v. Mouzone*, 687 F.3d 207, 217 (4th Cir. 2012), affected the verdict to a near certainty. *Cf. BMG Rights Mgmt. (US) v. Cox Commc'ns*, 881 F.3d 293, 305 (4th Cir. 2018) (vacatur requires "a reasonable probability that the erroneous instruction affected the jury's verdict"). Krakauer's sole proof was a list of phone numbers that SSN had called. *Supra* 26 (discussing Five9 records). But Krakauer introduced no evidence and made no argument that the phone numbers didn't change hands, or that any particular individual (apart from himself) received both calls. *Supra* 33-36. The verdict must therefore be reversed. *See Palmetto State Med. Ctr. v. Operation Lifeline*, 117 F.3d 142, 147 (4th Cir. 1997) (reversing judgments where the court

issued erroneous instructions and "no evidence was presented" that

could have supported liability).

## III. No Reasonable Jury Could Find DISH Liable For The Calls Made By SSN.

The problems in this case aren't just limited to the plaintiffs; the

defendant is the wrong one too. Specifically, the verdict must be

reversed because the court erroneously permitted the jury to hold DISH

liable for SSN's misdeeds. "[C]ommon sense is opposed to making one

man pay for another man's wrong." Oliver Wendell Holmes, Jr.,

*Agency*, 5 Harv. L. Rev. 1, 14 (1891). That proposition is embodied in

common-law principles of agency, and the court here "went well beyond

[these] traditional principles" to find an agency relationship. *Meyer v.

Holley*, 537 U.S. 280, 286, 290-91 (2003).

Because the facts concerning the relationship between DISH and

SSN are not meaningfully in dispute, it is a "question of law" whether

those facts gave rise to an agency relationship. *Cilecek v. Inova Health

Sys. Servs.*, 115 F.3d 256, 261 (4th Cir. 1997); *see also Bocek v. JGA

Assocs.*, 616 F. App'x 567, 576 (4th Cir. 2015) (unpublished) ("Whether

those undisputed facts establish the agency relationship is a legal

question for us to decide."). As the court acknowledged, DISH could be

vicariously liable for SSN's calls only if Krakauer proved (1) that DISH authorized SSN to act as its agent, and (2) that SSN acted within the scope of that authority when it made calls violating the TCPA. JA583. But the contracts between DISH and SSN expressly *withheld* actual authority, and DISH did not have the day-to-day control necessary to create agency. *Infra* § III.A. Moreover, even if SSN had been endowed with actual authority, SSN blatantly exceeded its scope when it violated DISH's express instructions, including not to call Krakauer in particular. *Infra* § III.B.

## A.    SSN was not DISH's agent.

**1.** "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests *assent* to another person (an 'agent') that the agent shall act on the principal's behalf *and subject to the principal's control*, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01 (emphasis added). The italicized provisions are critical. There must be assent: a clear, mutual agreement that the agent has authority to bind the principal. *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 393-94 (1982); *see New Millennium Consulting v. United HealthCare*

40

*Servs.*, 695 F.3d 854, 857, 859 (8th Cir. 2012) (no assent where parties'
agreement disclaimed agency); Restatement (Third) of Agency § 1.01
cmt. d; *id.* § 3.01.  Assent may be express or implied, *United States v.
Ellis*, 527 F.3d 203, 208 (1st Cir. 2008), but without it, there can be no
agency.

A principal also must have the power to "control" the agent's "day-
to-day operations."  *Carlisle v. Deere & Co.*, 576 F.3d 649, 656 (7th Cir.
2009); *Hofherr v. Dart Indus.*, 853 F.2d 259, 262 (4th Cir. 1988).[3]  For
the principal to be bound by the agent's actions, it must have "the right
to control" those actions.  Restatement (Third) of Agency § 1.01 cmt. f.
This requirement applies equally to the TCPA.  *E.g.*, *Keating v.
Peterson's Nelnet*, 2014 WL 1891369, at *5 (N.D. Ohio May 12, 2014)
(TCPA plaintiff must show "that the defendant controlled or had the
right to control [the caller] and the manner and means of the ...
campaign they conducted"), *aff'd*, 615 F. App'x 365 (6th Cir. 2015); *see*

---

[3] *See also Williams v. United States*, 50 F.3d 299, 306 (4th Cir. 1995)
(United States must "supervise[] the 'day-to-day operations' of the
endeavor" to create agency under the FTCA); *Wynn's Extended Care v.
Bradley*, 619 F. App'x 216, 219 (4th Cir. 2015) (unpublished) (no agency
absent "power to control ... day-to-day operation").

*Meyer*, 537 U.S. at 285 (traditional agency-law principles apply to federal statutory torts).

**2.** Krakauer demonstrated neither assent nor control. Far from assenting to an agency relationship, the companies' express understanding was that SSN—like the thousands of other companies authorized to market DISH's services—was an independent contractor.

That understanding is reflected in the strongest evidence of the relationship between DISH and SSN: the "contract actually executed between the parties." *Logue v. United States*, 412 U.S. 521, 530 (1973); Restatement (Third) of Agency § 1.03 (manifestations of intent determine whether an agency relationship was formed). Such "formal written" instructions are "often dispositive," Restatement (Third) of Agency § 2.02 cmts. c, f, g, because an "agent has no authority to act contrary to the known wishes and instructions of his principal," *Old Sec. Life Ins. Co. v. Cont'l Ill. Nat'l Bank and Tr. Co.*, 740 F.2d 1384, 1391 (7th Cir. 1984).

Here, the Retailer Agreements between DISH and SSN unambiguously and repeatedly made clear that SSN was acting, not as an agent, but "as an independent contractor." JA764; *accord* JA801,

42

979. Section 11 emphasizes that SSN is not, and may not claim to be, DISH's agent:

> INDEPENDENT CONTRACTOR. The relationship of the parties hereto is that of independent contractors. Retailer shall conduct its business as an independent contractor .... Retailer ... shall not, under any circumstances, hold itself out to the public or represent that it is EchoStar[4] or an ... agent, or sub-agent of EchoStar....

JA784, 822, 982.

DISH repeatedly confirmed this understanding. In 2006, for instance, DISH reminded SSN that

> [t]he Retailer Agreement clearly provides that your relationship with EchoStar is that of an independent contractor. Your outbound and inbound call agents MUST identify the company that they work for. AGENTS MAY NOT SAY THAT THEY WORK FOR DISH NETWORK.

JA967; *see* JA970 (equally direct message in 2007).

That DISH and SSN "expended such considerable efforts to avoid an agency designation is palpable evidence that [they] did not intend to consent … to an agency relationship." *CFTC v. Gibraltar Monetary Corp.*, 575 F.3d 1180, 1189 (11th Cir. 2009). The written understanding of contracting parties is powerful evidence of their relationship. *E.g.*,

---

[4] DISH formerly was known as EchoStar.

43

*Children's Broad. Corp. v. Walt Disney Co.*, 245 F.3d 1008, 1022 (8th Cir. 2001) (decisive that parties "expressly disclaimed" agency relationship); *NLRB v. Local Union 1058*, 957 F.2d 149, 152-53 (4th Cir. 1992) (written constitution and bylaws show that "individuals clearly did not have the actual authority" to act as agents); *Standard Acc. Ins. v. Simpson*, 64 F.2d 583, 588 (4th Cir. 1933) (no actual authority where a "letter of instructions expressly forbade such action"); *Integrated Consulting Servs. v. LDDS Commc'ns*, 176 F.3d 475, 1999 WL 218740, at *4-6 (4th Cir. 1999) (unpublished) (parties' conduct did not overcome an express written disclaimer of agency).

Krakauer presented *no* evidence at trial—no witness and no document—indicating that DISH or SSN read the contracts, despite their plain terms, as creating an agency relationship. On the contrary, the testimony was entirely consistent with the express disclaimer of an agency relationship. *See* JA368-70, 378, 442, 454, 483. And that made perfect sense. DISH and SSN had no reason to create a fiduciary relationship. DISH wanted SSN to market its services; SSN wanted to work with DISH; and neither needed an agency relationship to do that.

They just needed to enter into an ordinary contract, like companies do all the time in the marketing context.

**3.** Notwithstanding the parties' express agreement, the court thought *other* contractual provisions implicitly created the agency relationship that the same contracts explicitly rejected in Section 11. JA556, *cited in* JA584. Those other provisions would have to be especially powerful to nullify the contracts' express disavowals of agency; to interpret them as doing so would violate the "cardinal principle of contract construction: that a document should be read to give effect to all its provisions and to render them consistent with each other." *Mastrobuono v. Shearson Lehman Hutton*, 514 U.S. 52, 63 (1995). But, interpreting the contract de novo, *see Sky Angel U.S. v. Discovery Commc'ns*, 885 F.3d 271, 278 (4th Cir. 2018), there is no indication that the parties intended to negate Section 11's definition of their relationship. Instead, the provisions highlighted by the court merely authorize DISH to enforce performance standards and exercise quality control—provisions that are routine in independent contractor and franchisee relationships. *E.g.*, *Hoffnagle v. McDonald's Corp.*, 522 N.W.2d 808, 810, 812-13 (Iowa 1994) (detailing McDonald's extensive

control over franchisees); *see* Restatement (Third) of Agency § 1.01 cmt. f.

The court pointed to Section 2.3, which requires SSN "to use its best efforts to continuously and actively advertise, promote and market Programming." JA556 (citing JA768). But of course SSN had to use its best efforts to market DISH—that was the whole point of this contract. The court cited no support for the idea that requiring a party to perform its contractual obligations shows day-to-day control. Rather, the thing that "distinguishes … [an] agency agreement from other agreements" is "the element of continuous subjection to the will of the principal." Restatement (Second) of Agency § 1 cmt. b; *Integrated Consulting Servs.*, 1999 WL 218740, at *5.

Nor did the parties negate their express disavowal of agency by means of the statement buried in Paragraph 7.4 that any "records created or maintained by, or on behalf of, EchoStar relating to any DISH Network Subscriber" belong to DISH. JA780, *cited at* JA556. It stands to reason that DISH would own the records concerning its subscribers and SSN would control the records regarding its prospects.

46

Nothing about such an arrangement establishes assent to an agency relationship, much less operational control.

Finally, the court relied on a single sentence that it thought "gave Dish nearly unlimited power to impose additional requirements on SSN." JA557, *cited at* JA584. That sentence, however, says nothing about agency. It is buried in the middle of a section about how retailers take orders, in a subsection governing DISH's promotional offers. Specifically, Section 7.3 requires retailers to follow DISH's pricing and terms for promotional programming. JA780. Retailers must make accurate disclosures to customers, i.e., "disclose to each prospective DISH [customer] the relevant terms of … each Promotional Program." JA780. In that context, Section 7.3 states that Retailers must "comply with all" rules "applicable to any Promotional Program" and "take all actions and refrain from taking any action, as requested by [DISH] in connection with the marketing, advertisement, promotion and/or solicitation of orders." JA556 (quoting JA780).

Thus, Section 7.3 does not broadly confer "unlimited power"; it means that retailers cannot promise customers promotional packages, prices, or terms that DISH does not offer (e.g., "$1 HBO!"). JA780. And

47

if DISH directs the retailer to stop making an offer, or to correct erroneous advertising, the retailer must comply. JA780. That understanding was confirmed by uncontroverted testimony. JA350-51, 371-72.

The district court's interpretation of Section 7.3 nullifies Section 11's express statement about agency, contrary to ordinary rules of contract interpretation, based on a single misinterpreted sentence buried on page 17 of a 37-page agreement. JA780. It also flouts the contract's clear direction that Section 11 applies "[n]otwithstanding anything … in this Agreement to the contrary." JA784. Instead, Section 7.3 shows at most that DISH "specif[ied] standards" for SSN to follow, *Logue*, 412 U.S. at 529-30, and "demand[ed] compliance with" them, *Williams*, 50 F.3d at 306. Such quality control is legally insufficient to show the day-to-day control necessary for agency. *Id.*; Restatement (Third) of Agency § 1.01 cmt. f; *see also Thomas v. Freeway Foods*, 406 F. Supp. 2d 610, 617 (M.D.N.C. 2005) (mere fact that a franchisor was contractually allowed to visit and inspect franchisees did not create agency).

**4.** Elsewhere, the court indicated that the parties' *conduct* established agency. Given the parties' express contractual understanding, any implied agency relationship could be established only through "clear and convincing evidence." *Simpson*, 64 F.2d at 588; *see also Leon v. Caterpillar Indus.*, 69 F.3d 1326, 1336 (7th Cir. 1995) (where "language in [a contract] … expressly disavows an agency relationship," evidence of the parties' conduct "falls short" unless it provides an especially powerful indication of a contrary intent). The court identified nothing of the kind.

The evidence was clear that DISH didn't want "to control the day-to-day activities of SSN"; doing so "wasn't practical." JA454-55. Indeed, given the sheer number of independent retailers around the country—some 3,500 in all—such control was out of the question. JA335, 377-78, 414, 481-84. So DISH hired SSN as an independent contractor that made its own hiring decisions, paid its own employees, set hours and terms of employment, and obtained its own office space, telephone lines, and equipment. JA366-68, 376-78, 458, 535-36.

Notably, the court itself found that "Dish did not own SSN *or direct its day-to-day operations*." JA555 (citing trial testimony). The

court was right.  Uncontroverted testimony established that SSN, not

DISH, determined what phone numbers SSN would call, and indeed

whether SSN would engage in telemarketing at all.  JA366-67, 375-76,

458, 482, 535-36.  DISH's Senior Vice President in charge of indirect

sales explained that DISH did not "ha[ve] the right to control SSN's

sales pitch." JA374-76.  And DISH's compliance manager elaborated

that SSN's marketing strategies were proprietary and SSN "didn't want

anyone to have information about … their actual sales script

and … how they were selling."  JA454-56.

DISH did not even require exclusivity; SSN at one time marketed

DISH's biggest competitor, DirecTV.  JA841, 368, 478-79, 531-34.

*Compare Leon*, 69 F.3d at 1336 ("[T]hat Calumet could sell Caterpillar's

competitors' equipment is further evidence that Calumet was not acting

principally for Caterpillar's benefit, but rather as an independent sales

representative, to make a profit.").

Notwithstanding these undisputed facts, the court thought the

parties' conduct established agency.  It cited evidence that DISH

imposed certain performance requirements on SSN—for instance, by

requiring SSN to comply with telemarketing laws and scrub its call lists

with PossibleNow (a company specializing in TCPA compliance) to ensure they contained no numbers on the Registry.  JA584.  But, just like imposing quality-control standards, *supra* 47-48, requiring compliance with government laws and regulations does not create an agency relationship.  *See FedEx Home Delivery v. NLRB*, 563 F.3d 492, 501 (D.C. Cir. 2009) (performance requirements based on efforts to comply with government regulation do not support agency because the "company is not controlling the [contractor], the law is").  It would be the height of irony—and very bad policy—to hold DISH liable because it told SSN *not* to violate the TCPA.

The court also pointed to a 2009 Assurance of Voluntary Compliance (AVC) between DISH and state attorneys general.  The AVC focused on DISH's own obligations regarding various consumer issues, and DISH agreed to monitor and discipline retailers for telemarketing violations.  JA584.  The court found this to be evidence of DISH's ability to control SSN's day-to-day marketing operations.  JA584 (citing JA562-63).  But the AVC expressly recognizes that retailers like SSN are "independent."  JA853.  Moreover, a third-party covenant to look for contractor violations does not establish the control

51

that is necessary for an agency relationship. *Supra* 48-50. Holding otherwise would profoundly change settled business expectations and expose countless companies to liability for engaging in routine compliance practices. Including this commonplace requirement did not convert an independent contractor into an agent.

### B. Even if SSN were DISH's agent, it exceeded its authority when it made these calls.

Even when agency exists, a principal is liable only for acts within the scope of the agent's authority. *Meyer*, 537 U.S. at 285; *United States v. Hilton*, 701 F.3d 959, 970 (4th Cir. 2012); Restatement (Third) of Agency § 2.02. Unlawful acts are almost never within the scope of an agent's authority, except in the rare situation where the principal issued clear instructions to break the law. Restatement (Third) of Agency § 2.02 cmt. h; *see also id.* § 2.02 cmt. c (scope of an agent's authority must be based on "the principal's manifestations to the agent"). Here, DISH expressly limited SSN's authority by instructing it not to call numbers on the Registry. And it unambiguously instructed SSN not to call Krakauer himself. SSN acted outside the scope of any authority by disregarding those instructions.

**1.** The district court concluded that SSN acted within the scope of its authority because DISH "consent[ed] or acquiesce[d]" to the conduct. JA585-86. On the contrary, DISH repeatedly and unequivocally instructed SSN to follow the law:

> Retailer shall comply with all applicable governmental statutes, laws, rules, regulations, ordinances, codes, directives, and orders …, and Retailer is solely responsible for its compliance ….

JA782, 818. Such contractual provisions are common and essential; it is near-impossible to scrutinize every action taken by a nationwide network of independent contractors.

More specifically, retailers were told to comply with *telemarketing* laws. DISH repeatedly stressed that it does "not tolerate or condone marketing activities that fail to comply with … applicable state and federal laws." JA966 ("Facts Blast"); *see* JA964 (same), 970 (script for chat with retailers), 1006 (email to SSN), 490-92, 494 (testimony). More specific still, DISH required retailers to "[c]omply with all applicable state and federal 'Do Not Call' laws, including, but not limited to … the Telephone Consumer Protection Act." JA966.

If those directions left any doubts, they should have been resolved when DISH told SSN not to call Krakauer. This is particularly critical

53

because, as the court instructed the jury, if Krakauer "fails to establish any essential part of his claim by a preponderance of the evidence, then you should find against him and the class …." JA511. And the evidence was unrefuted that SSN acted outside the scope of any authority when it called Krakauer. When SSN first called Krakauer to market DISH services, Krakauer complained to DISH. *Supra* 7. DISH instructed SSN to "immediately insure that this phone number has been added to your internal [Do Not Call] Registry." JA1048, 429-31. SSN assured DISH that it had addressed the issue, removed Krakauer's phone number from its list of numbers to be called, and added Krakauer's phone number to its internal Do Not Call list. JA1045-46, 432-34; *supra* 8.

In the face of this evidence, no reasonable jury could conclude that SSN believed it had authority to call Krakauer. *Simpson*, 64 F.2d at 588 (agent exceeded his authority when the principal "expressly forbade" the conduct); *see* Restatement (Third) of Agency § 2.02 cmt. g ("[A]n agent's actual authority extends only to acts that the agent reasonably believes the principal has authorized or wishes the agent to perform."). And even if DISH's instructions about Krakauer weren't

54

dispositive, SSN's disregard of DISH's other, repeated instructions to comply with the law, including telemarketing laws, should have been. When an agent "expressly contradict[s]" the principal's "actual instructions, this is clearly not express … agency." *Bridgeview Health Care Ctr. v. Clark*, 816 F.3d 935, 939 (7th Cir.), *cert. denied*, 137 S. Ct. 200 (2016).

*Bridgeview* is closely analogous. In that case, the defendant contracted with a marketer to send "about 100 faxes to local businesses within a 20-mile radius" of a town. Instead, the marketer sent nearly 5,000 faxes across three states in violation of the TCPA. *Id.* at 937. The Seventh Circuit held that the defendant could not be held liable for faxes sent outside the scope of the defendant's authorization. *Id.* at 938-39. The result here follows a fortiori: Not only did DISH *not authorize* the calls here, it *forbade* them. A contract between a company and its marketer "prohibiting telemarketing methods that would violate state or federal law" "preclude[s]" liability. *Jones v. Royal Admin. Servs.*, 887 F.3d 443, 446 (9th Cir. 2018).

**2.** In ruling otherwise, the court attributed to the jury the conclusion that, by failing to adequately monitor SSN's telemarketing

compliance, DISH implicitly overruled its express instruction that SSN *did* have to comply with the law.  JA586-89.  This unlikely theory fails as a matter of law.  Neither Krakauer nor the court cited any authority holding that a principal's mere failure to supervise creates actual authority for an agent to act.  That would be a particularly strange rule where legal violations are concerned.  As discussed above (at 52), authority to violate the law is rare and it must be clearly expressed.  It would have to be especially clearly expressed here, given that DISH specifically said *not* to violate the law.  A mere failure to supervise can't possibly do that work.

Furthermore, no witness testified and no document showed that DISH's repeated instructions not to violate the TCPA were "empty words" that SSN interpreted as meaning the opposite.  JA571 (willfulness order).  No employee or officer of SSN or DISH testified that SSN believed it could ignore DISH's instructions.  Krakauer presented no document saying so.  Simply put, there is no evidence that DISH wanted SSN to act in the unlawful fashion it did.  To conclude otherwise would eviscerate the requirement that an agent must act within the scope of its authority.

## IV.    The Treble-Damages Award Must Be Overturned.

Finally, the treble damages cannot stand.

The reason the court trebled damages is clear:  It thought DISH should have done more to monitor SSN, including by hiring an outside auditor.  JA549, 566.  But everyone always can do more.  That's why, even for mere *negligence*, there must be a legal duty to act. Restatement (Second) of Torts § 284; *Spaulding v. Wells Fargo Bank*, 714 F.3d 769, 780 (4th Cir. 2013).  The court identified no such duty, and even if it had, treble damages aren't available for negligence; the TCPA authorizes them only when "the defendant willfully or knowingly" disregarded the statute.  47 U.S.C. § 227(c)(5)(C).  A plaintiff must show the defendant knew it "was performing the conduct that violates the statute," *Lary v. Trinity Physician Fin. & Ins. Servs.*, 780 F.3d 1101, 1107 (11th Cir. 2015) (TCPA case), or assumed "a risk of violating the law substantially greater than the risk associated with … mere[] careless[ness]," *Safeco*, 551 U.S. at 69 (articulating willfulness standard).

The court did not apply this standard.  JA569, 575 n.17.  Instead, it imputed *SSN's* supposed willfulness and knowledge to DISH, and

57

determined that DISH "should have known" about SSN's conduct—that is, that DISH was negligent in failing to "investigate and monitor" SSN more closely. In both respects, the court erred as a matter of law. *Infra* § IV.A. And under the proper standard, DISH's conduct was not willful or knowing. *Infra* § IV.B. Accordingly, damages must be reduced to the $400-per-call awarded by the jury; or, at a minimum, the case must be remanded for application of the proper legal standard.

### A. The damages must be vacated because the district court made two legal errors in applying the willful-or-knowing standard.

#### 1. The court applied the wrong legal standard when it imputed SSN's conduct to DISH.

The district court concluded that "SSN willfully and knowingly violated the provisions of the TCPA," and that SSN's conduct could be "imputed to DISH." JA569. It applied what it called the "traditional rule" that "a principal is liable for the willful acts of his agent." JA570.

On the contrary, the rule has been something else for at least two centuries. If a principal neither "directed [its agent's conduct], nor countenanced it, nor participated in it," the principal may be "bound to repair all the real injuries"—that is, pay compensatory damages—but the principal is not liable for "vindictive damages." *The Amiable Nancy*,

16 U.S. (3 Wheat) 546, 558-59 (1818); *accord Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 544 (1999). Rather, a principal is liable for enhanced damages based on the agent's conduct only when the principal engages in "reckless disregard of federally protected rights." *Kolstad*, 527 U.S. at 544. The principal's *own conduct* must reflect this heightened responsibility.

The two sources cited by the district court (at JA570) do not hold otherwise. The first is a passing statement by the Oklahoma Supreme Court that "a principal … is generally held liable for the willful acts of an agent" under Oklahoma law. *Bosh v. Cherokee Cty. Bldg. Auth.*, 305 P.3d 994, 998 (Okla. 2013). That court simply acknowledged that a principal can be liable for an agent's conduct "even though the servant or agent … willfully or maliciously committed the wrongs," *id.* at 998 n.14—i.e., that an agent's willfulness doesn't necessarily *foreclose* the principal's liability. The other citation, Restatement (Third) of Agency § 7.04, merely states that a principal is generally liable for conduct by an agent within the scope of its authority. Neither source purports to establish rules concerning vicarious liability for enhanced damages.

## 2.    The court applied a legally incorrect standard for willful conduct.

The court held in the alternative that DISH itself acted willfully. JA569. In doing so, it applied a legally incorrect standard.

Willfulness is not to be found "in a typical ... case," but only in rare cases involving "egregious ... behavior." *Halo Elecs. v. Pulse Elecs.*, 136 S. Ct. 1923, 1932 (2016). Thus, to "willfully" violate federal law, one must act "recklessly": with an "unjustifiably high risk of" violating the statute. *Safeco*, 551 U.S. at 57-58, 68; *see McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 132-33 (1988); *TWA v. Thurston*, 469 U.S. 111, 125-26 (1985). "[A] reckless defendant is one who ... knows of a substantial and unjustified risk of such wrongdoing" and acts nonetheless. *Global-Tech Appliances v. SEB S.A.*, 563 U.S. 754, 770 (2011); *RSM v. Herbert*, 466 F.3d 316, 321-22 (4th Cir. 2006).[5]

---

[5] The standard for "knowing" conduct is equally high, requiring actual knowledge of the circumstances giving rise to liability. *RSM*, 466 F.3d at 320-22. "[T]he violator [must] know he was performing the conduct that violates the statute." *Lary*, 780 F.3d at 1107. It is not enough "that the violator knew he was making a call." *Id.* Although the court asserted in passing that DISH acted "willfully and knowingly," JA569, it did not analyze the question of knowing conduct or make the requisite findings, JA571-76.

Willfulness thus requires more than mere "careless[ness]" or "negligence." *Safeco*, 551 U.S. at 68-69.  Indeed, it requires a "substantially greater" showing than negligence, *id.* at 69 (quoting Restatement (Second) of Torts § 500)—so much greater that it amounts "to a difference in kind," *Mosser v. Fruehauf Corp.*, 940 F.2d 77, 85 (4th Cir. 1991) (quoting Restatement (Second) of Torts § 500 cmt. g).  This heightened standard preserves "the statute's distinction between violations that do not require an intent, and those willful[] and knowing violations that [C]ongress intended to punish more severely." *Lary*, 780 F.3d at 1107.

The district court applied a substantially lower, legally incorrect standard.  In assessing willfulness, it asked whether DISH "*ha[d] reason to know, or should have known*, that [SSN's] conduct would violate the statute." JA569 (emphasis added).  But "know or should have known" is the standard for negligence, not willfulness. *See BMG Rights Mgmt.*, 881 F.3d at 308; *Coston v. Plitt Theatres*, 831 F.2d 1321, 1338 (7th Cir. 1987) (Manion, J., concurring) (collecting cases rejecting "knew or should have known" for willfulness), *vacated on other grounds*, 486 U.S. 1020 (1988).

61

The court didn't just use the terminology of negligence; it used the concepts too. Over and over, the court castigated DISH for failing to adequately "monitor" and "investigate" SSN. *E.g.*, JA549, 554, 560, 571, 572, 574, 576; *see also* JA666 n.22. And it purported to balance the cost of monitoring with the likelihood of discovering violations. JA576. But the reasonableness of preventative actions "bear[s] primarily on the question of negligence." *Mosser*, 940 F.2d at 86. There could be no negligence (leave aside willfulness) unless the TCPA imposed a duty of care on DISH, and the court identified no such duty.

Instead, the court focused on DISH's supposed failures under the AVC, the 2009 voluntary agreement between DISH and 46 state attorneys general. *Supra* 51. DISH, the court said, "did not take seriously the promises it made" in the AVC. JA577. Over and over the court came back to this document and DISH's supposed breaches. JA562-564, 577. But, among the other problems with relying on this agreement (*infra* 71-72), the AVC creates no obligations under the TCPA. Rather, the AVC is a private agreement that, by its terms, confers no "rights or remedies" "upon any person" and "may not be enforced by any person, entity, or sovereign except the Attorneys

General." JA874. The agreement could not and did not create a TCPA duty, or a new willfulness standard, applicable solely to DISH.

## B. The damages must be reversed because DISH did not willfully violate the TCPA as a matter of law.

Alternatively, the enhanced damages should be reversed outright because DISH's conduct was not willful or knowing as a matter of law. *See Humphrey v. Humphrey*, 434 F.3d 243, 248 (4th Cir. 2006) ("court need not remand a case if the record permits only one resolution").

This is because DISH had an "objectively reasonable" basis to believe it was complying with the TCPA. *Safeco*, 551 U.S. at 70 n.20. At the time of the calls, no court had imposed TCPA liability on an entity that did not initiate calls, based on the conduct of its agent. Moreover, it was reasonable to believe that SSN was not DISH's agent. *Infra* § IV.B.1. And even if DISH was unreasonable in that belief, it was not "obvious" to DISH that SSN presented a "substantial[]" and "unjustifiabl[e] … risk" of placing tens of thousands of unlawful Registry calls during the class period, *Safeco*, 551 U.S. at 68-69, especially given DISH's explicit instructions. *Infra* § IV.B.2. The treble damages therefore must be reversed.

### 1. DISH reasonably believed, based on its contracts with SSN and compliance measures, that it had satisfied its legal obligations.

Conduct is not willful or knowing if it is based on an "erroneous, [but] not objectively unreasonable" understanding of the law. *Safeco*, 551 U.S. at 69; *see id.* at 70 n.20. Thus, in *Safeco* the Supreme Court held that an analogous willfulness requirement was not satisfied where the defendant's errant belief in the lawfulness of its conduct was "not reckless." *Id.* at 70-71; *accord RCA/Ariola Int'l v. Thomas & Grayston Co.*, 845 F.2d 773, 779-80 (8th Cir. 1988) (manufacturer's reasonable belief that it would not be held vicariously liable foreclosed willfulness). Here, similarly, even if DISH could be held liable for calls made by SSN (which it could not, *supra* 39-56), at a minimum DISH could reasonably believe otherwise.

Before the end of the class period, no court had held that an entity (like DISH) that neither placed violative calls nor directed an agent to call specific people could be held liable. And the TCPA supplied no clear answer. That is why the Sixth Circuit referred the question to the FCC. *Charvat v. EchoStar Satellite, LLC*, 630 F.3d 459, 465-66 (6th Cir. 2010). The FCC itself then struggled with the question. It reasoned

that the TCPA's plain text indicates that "a seller" (here, DISH) "is *not* directly liable for a violation of the TCPA unless it initiates a call" itself. 28 FCC Rcd. 6574, 6582 (2013) (emphasis added).  But it nonetheless "construed [the TCPA] to incorporate federal common law agency principles" "for TCPA violations committed by third-party telemarketers."  *Id.* at 6584.

That 2013 decision—two years after the class period—was the first time a court or agency held that a seller like DISH could be liable under the TCPA for calls it did not place.  Thus, because "the statutory text and relevant court and agency guidance allow[ed] for more than one reasonable interpretation," DISH cannot be a "knowing or reckless violator."  *Safeco*, 551 U.S. at 70 n.20; *see Murray v. New Cingular Wireless Servs.*, 523 F.3d 719, 726 (7th Cir. 2008).

Moreover, even under the agency standard since articulated by the FCC, DISH would not have been "objectively unreasonable" in concluding, during the class period, that SSN was not its agent.  The contracts between DISH and SSN stated explicitly that there was no agency relationship.  *Supra* 6, 42-43.  No witness testified and no document suggested that DISH or SSN understood themselves to be in

a principal-agent relationship. *Supra* 44, 49-50. DISH surely was reasonable in believing that SSN would not act outside the scope of any authority by disregarding DISH's express directions not to call people on the Registry. *Supra* 52-56. And courts had rejected agency arguments about other DISH retailers. *E.g.*, *Charvat v. EchoStar Satellite, LLC*, 676 F. Supp. 2d 668, 678-79 (S.D. Ohio 2009), *vacated*, 535 F. App'x 513 (6th Cir. 2013). It was objectively reasonable to believe that SSN was not DISH's agent.

> ## 2. DISH did not disregard a substantial risk that SSN was placing tens of thousands of Registry calls in 2010 and 2011.

**a.** DISH also did not act willfully because on no view of the evidence did it knowingly disregard a substantial risk that SSN was violating the TCPA *on a widespread basis*. That is what the district court would have to have found. In individual actions, each plaintiff would have to prove DISH acted willfully with respect to each individual violation. 47 U.S.C. § 227(c)(5)(C); *Levy v. Receivables Performance Mgmt.*, 972 F. Supp. 2d 409, 425 (E.D.N.Y. 2013) ("[T]reble damages are assessed based on each individual violation."). The class-action device did not relieve them of that burden. *See, e.g.*, *Deposit*

*Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 332 (1980) (class action "is a procedural right only").

At issue here is the class period from May 2010 to August 2011. There is no evidence DISH knew SSN was engaged in widespread TCPA violations during this period.  SSN placed over 1.6 million calls selling DISH services during that time, and DISH didn't receive a single complaint from an SSN call recipient.  JA451; *supra* 9.

That indicated to DISH that SSN presented little risk of TCPA violations, let alone a "high risk" of *widespread* violations.  *Safeco*, 551 U.S. at 68.  As noted above (at 7), DISH's head of third-party compliance gave uncontroverted testimony that violations correlate with complaints:  One would expect a "staggering number" of complaints if a retailer took no precautions to avoid calling people on the Do Not Call Registry, yet DISH received none during the class period.  JA436-37.

**b.**  With no complaints about calls made during the class period, Krakauer had to prove willfulness some other way.  He pointed to a handful of complaints about SSN that DISH received *prior* to the class period.  JA558-60.  The court concluded that DISH's decision to

67

continue contracting with SSN after these complaints, and "not take any action to monitor or oversee SSN," showed willful participation by DISH in SSN's violations *during* the class period.  JA560, 572.

The mere fact that DISH knew of a few earlier complaints doesn't establish DISH acted willfully during the relevant time.  Indeed, prior violations, without more, don't demonstrate willfulness even when the defendant *itself* engaged in the prior conduct.  *Levy*, 972 F. Supp. 2d at 425 ("[T]he fact that [the defendant] has been found to have violated the TCPA in other instances does not suggest, as a matter of law, that they acted knowingly and willfully."); *McCaskill v. Navient Sols.*, 178 F. Supp. 3d 1281, 1294-95 (M.D. Fla. 2016) (same).

If those prior complaints were relevant at all, it would only be to show whether DISH was reckless in concluding (during the class period) that SSN posed no risk of widespread TCPA violations.  *See Safeco*, 551 U.S. at 69.  But the evidence is clear.  It was reasonable (and at worst, negligent) to believe SSN posed no such risk.  Following complaints about SSN placing pre-recorded calls in 2004 (years before the class period), JA558-59, and lawsuits against SSN in that period under state

Do Not Call statutes,[6] DISH repeatedly admonished SSN to comply with the law—and the pre-recorded call violations stopped. *See* JA1032, 934, 938, 572 (finding calls stopped). In 2006, moreover, SSN changed its management. JA420. And in 2008, SSN contracted with PossibleNow—the industry leader in telemarketing-compliance services—to scrub its call lists. JA1042, 412-13, 428.

As a result, from the time of the 2006 management change through the end of the class period in 2011, DISH received only five Registry-related complaints from SSN call recipients. JA409; *supra* 6-7. Measured "against a background of millions of calls," this raised no "red flag for" SSN. JA408; *see also* JA423, 447, 454. The district court thought it unreasonable for DISH to rely on complaints as the barometer of TCPA compliance. JA573-74&n.15. But again, "reasonableness" wasn't the standard; that denotes negligence. *Supra* 60-62. And DISH's conclusion was not reckless: "[E]ven a few[] inadvertent errors … may not amount to 'willful' failures, even when

---

[6] JA320, 420, 447-48. SSN settled the North Carolina suit with no admission of wrongdoing, and the Florida suit resulted in an injunction requiring SSN to comply with the law. JA880-81 (North Carolina), 883 (Florida). Neither suit involved calls marketing DISH services.

the legal requirement … was known." *RSM*, 466 F.3d at 322. That holds especially true for the TCPA; perfect TCPA compliance is nearly impossible. JA423-24, 470. In short, DISH reasonably believed that SSN had "righted [its] wrongs." JA1008, 447-48.

**c.** Nor, contrary to the district court's conclusion, did complaints from Krakauer or a Mr. Campbell about pre-class-period calls alert DISH that "SSN was not scrubbing its customer lists" against the Registry during the class period. JA566, 571, 574. The court believed these facts established willfulness because, in its view, a telemarketer who uses unscrubbed lists knows it will call people on the Registry. *Id.*

Both the premise and the conclusion are mistaken. When DISH investigated, SSN provided a reasonable explanation: Krakauer and Campbell had been SSN customers, and so fell within a TCPA exception for established business relationships. *See* JA999-1000, 1040. This therefore indicated no widespread problem with scrubbing, because there is no obligation to scrub established business relationships against the Registry. *Supra* 8. DISH also did not leave it at that. DISH "caution[ed]" SSN to seek "legal counsel" to confirm its understanding of the established business relationship exception.

JA1039.  SSN promised it would never call either person again.  JA999, 1040.  And DISH received no further complaints from people with whom SSN said it had established business relationships.

**d.**  Last, the court believed DISH was blameworthy because it "did not take seriously the promises it made" in the AVC.  JA577.  We explain above (at 62-63) why that was legal error.  Furthermore, using the TCPA to punish DISH's supposed non-compliance with the AVC violates due process.  "Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis …."  *State Farm Mut. Auto. Ins. v. Campbell*, 538 U.S. 408, 420, 423 (2003).

That's especially true because the court itself admitted the AVC, over DISH's strenuous Rule 403 objection, for one limited purpose: assessing agency.  JA307.  The court therefore erred when it used the document to assess willfulness.  *United States v. Poole*, 640 F.3d 114, 118 (4th Cir. 2011) (court erred when it "apparently gave some consideration to matters that were not in evidence in the case").  Had DISH known that compliance with the agreement would be used to

assess willfulness, it would have responded with evidence establishing its compliance.[7]  For instance, DISH would have shown—as the federal court in Illinois found—that DISH made "real changes … in late 2008 and 2009" when it "fired numerous Retailers, cut the number of Order Entry Retailers, and instituted changes in the Quality Assurance program." *United States v. Dish Network LLC*, 256 F. Supp. 3d 810, 987 (C.D. Ill. 2017); *see also id.* at 854-55.

Because the finding of willfulness fails as a matter of law, the treble damages must be reversed.

---

[7] The court mischaracterized DISH's co-founder as having said that the AVC "did not change DISH's procedures at all."  JA577-78.  The testimony was that DISH disciplined retailers both before and after the AVC.  JA488-89.

## CONCLUSION

For the foregoing reasons, the judgment should be reversed; in the alternative, vacated; and at a minimum, the treble-damages award must be vacated or reversed.

Respectfully submitted,

*/s/ Eric A. Shumsky*

| | |
|---|---|
| E. Joshua Rosenkranz | Eric A. Shumsky |
| Peter A. Bicks | Kelsi Brown Corkran |
| Elyse D. Echtman | Jeremy R. Peterman |
| John L. Ewald | ORRICK, HERRINGTON & |
| Christopher J. Cariello | SUTCLIFFE LLP |
| ORRICK, HERRINGTON & | 1152 15th Street |
| SUTCLIFFE LLP | Washington, DC 20005 |
| 51 West 52nd Street | (202) 339-8400 |
| New York, NY 10019 | |
| (212) 506-5000 | Paul D. Meyer |
| | ORRICK, HERRINGTON & |
| | SUTCLIFFE LLP |
| | 405 Howard Street |
| | San Francisco, CA 94105 |
| | (415) 773-5700 |

*Counsel for Defendant-Appellant*

February 19, 2019

## ORAL ARGUMENT STATEMENT

In light of the number and complexity of issues raised, DISH believes that oral argument would assist the Court in resolving the appeal and respectfully requests the opportunity to present oral argument.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i), as enlarged by order of this Court dated September 24, 2018, Doc. 35 (permitting brief not in excess of 14,000 words), because this brief contains 13,944 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Century Schoolbook 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Eric A. Shumsky*
Eric A. Shumsky
*Counsel for Defendant-Appellant*

# ADDENDUM OF STATUTES AND REGULATIONS

Page

47 U.S.C. § 227.................................................................ADD1

47 C.F.R. § 64.1100.........................................................ADD27

47 C.F.R. § 64.1200.........................................................ADD29

47 C.F.R. § 64.1200 (1993).............................................ADD47

57 Fed. Reg. 48,333.........................................................ADD52

68 Fed. Reg. 44,144 (excerpt)..........................................ADD65

## 47 U.S.C. § 227 Restrictions on use of telephone equipment

(a) Definitions

As used in this section—

(1) The term "automatic telephone dialing system" means equipment which has the capacity—

(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and

(B) to dial such numbers.

(2) The term "established business relationship", for purposes only of subsection (b)(1)(C)(i) of this section, shall have the meaning given the term in section 64.1200 of title 47, Code of Federal Regulations, as in effect on January 1, 2003, except that—

(A) such term shall include a relationship between a person or entity and a business subscriber subject to the same terms applicable under such section to a relationship between a person or entity and a residential subscriber; and

(B) an established business relationship shall be subject to any time limitation established pursuant to paragraph (2)(G).[1]

(3) The term "telephone facsimile machine" means equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper.

---

[1] So in original. The second closing parenthesis probably should not appear.

(4) The term "telephone solicitation" means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person, but such term does not include a call or message (A) to any person with that person's prior express invitation or permission, (B) to any person with whom the caller has an established business relationship, or (C) by a tax exempt nonprofit organization.

(5) The term "unsolicited advertisement" means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise.

(b) Restrictions on use of automated telephone equipment

(1) Prohibitions

It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—

(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—

(i) to any emergency telephone line (including any "911" line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency);

ADD2

(ii) to the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or

(iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States;

(B) to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order by the Commission under paragraph (2)(B);

(C) to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement, unless—

(i) the unsolicited advertisement is from a sender with an established business relationship with the recipient;

(ii) the sender obtained the number of the telephone facsimile machine through—

(I) the voluntary communication of such number, within the context of such established business relationship, from the recipient of the unsolicited advertisement, or

(II) a directory, advertisement, or site on the Internet to which the recipient voluntarily agreed to make available its facsimile number for public distribution,

except that this clause shall not apply in the case of an unsolicited advertisement that is sent based on an established business relationship with the recipient that was in existence before July 9, 2005, if the sender possessed the facsimile machine number of the recipient before July 9, 2005; and

(iii) the unsolicited advertisement contains a notice meeting the requirements under paragraph (2)(D),

except that the exception under clauses (i) and (ii) shall not apply with respect to an unsolicited advertisement sent to a telephone facsimile machine by a sender to whom a request has been made not to send future unsolicited advertisements to such telephone facsimile machine that complies with the requirements under paragraph (2)(E); or

(D) to use an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are engaged simultaneously.

(2) Regulations; exemptions and other provisions

The Commission shall prescribe regulations to implement the requirements of this subsection. In implementing the requirements of this subsection, the Commission—

(A) shall consider prescribing regulations to allow businesses to avoid receiving calls made using an artificial or prerecorded voice to which they have not given their prior express consent;

(B) may, by rule or order, exempt from the requirements of paragraph (1)(B) of this subsection, subject to such conditions as the Commission may prescribe—

   (i) calls that are not made for a commercial purpose; and

   (ii) such classes or categories of calls made for commercial purposes as the Commission determines—

      (I) will not adversely affect the privacy rights that this section is intended to protect; and

      (II) do not include the transmission of any unsolicited advertisement;

(C) may, by rule or order, exempt from the requirements of paragraph (1)(A)(iii) of this subsection calls to a telephone number assigned to a cellular telephone service that are not charged to the called party, subject to such conditions as the Commission may prescribe as necessary in the interest of the privacy rights this section is intended to protect;

(D) shall provide that a notice contained in an unsolicited advertisement complies with the requirements under this subparagraph only if—

   (i) the notice is clear and conspicuous and on the first page of the unsolicited advertisement;

   (ii) the notice states that the recipient may make a request to the sender of the unsolicited advertisement not to send any future unsolicited advertisements to a telephone facsimile machine or machines and that failure to comply, within the shortest reasonable time, as determined by the Commission,

with such a request meeting the requirements under subparagraph (E) is unlawful;

(iii) the notice sets forth the requirements for a request under subparagraph (E);

(iv) the notice includes—

(I) a domestic contact telephone and facsimile machine number for the recipient to transmit such a request to the sender; and

(II) a cost-free mechanism for a recipient to transmit a request pursuant to such notice to the sender of the unsolicited advertisement; the Commission shall by rule require the sender to provide such a mechanism and may, in the discretion of the Commission and subject to such conditions as the Commission may prescribe, exempt certain classes of small business senders, but only if the Commission determines that the costs to such class are unduly burdensome given the revenues generated by such small businesses;

(v) the telephone and facsimile machine numbers and the cost-free mechanism set forth pursuant to clause (iv) permit an individual or business to make such a request at any time on any day of the week; and

(vi) the notice complies with the requirements of subsection (d) of this section;

(E) shall provide, by rule, that a request not to send future unsolicited advertisements to a telephone facsimile machine complies with the requirements under this subparagraph only if—

ADD6

(i) the request identifies the telephone number or numbers of the telephone facsimile machine or machines to which the request relates;

(ii) the request is made to the telephone or facsimile number of the sender of such an unsolicited advertisement provided pursuant to subparagraph (D)(iv) or by any other method of communication as determined by the Commission; and

(iii) the person making the request has not, subsequent to such request, provided express invitation or permission to the sender, in writing or otherwise, to send such advertisements to such person at such telephone facsimile machine;

(F) may, in the discretion of the Commission and subject to such conditions as the Commission may prescribe, allow professional or trade associations that are tax-exempt nonprofit organizations to send unsolicited advertisements to their members in furtherance of the association's tax-exempt purpose that do not contain the notice required by paragraph (1)(C)(iii), except that the Commission may take action under this subparagraph only—

(i) by regulation issued after public notice and opportunity for public comment; and

(ii) if the Commission determines that such notice required by paragraph (1)(C)(iii) is not necessary to protect the ability of the members of such associations to stop such associations from sending any future unsolicited advertisements;

(G)(i) may, consistent with clause (ii), limit the duration of the existence of an established business relationship, however, before establishing any such limits, the Commission shall—

ADD7

(I) determine whether the existence of the exception under paragraph (1)(C) relating to an established business relationship has resulted in a significant number of complaints to the Commission regarding the sending of unsolicited advertisements to telephone facsimile machines;

(II) determine whether a significant number of any such complaints involve unsolicited advertisements that were sent on the basis of an established business relationship that was longer in duration than the Commission believes is consistent with the reasonable expectations of consumers;

(III) evaluate the costs to senders of demonstrating the existence of an established business relationship within a specified period of time and the benefits to recipients of establishing a limitation on such established business relationship; and

(IV) determine whether with respect to small businesses, the costs would not be unduly burdensome; and

(ii) may not commence a proceeding to determine whether to limit the duration of the existence of an established business relationship before the expiration of the 3-month period that begins on July 9, 2005; and

(H) may restrict or limit the number and duration of calls made to a telephone number assigned to a cellular telephone service to collect a debt owed to or guaranteed by the United States.

(3) Private right of action

A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State—

(A) an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,

(B) an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or

(C) both such actions.

If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

(c) Protection of subscriber privacy rights

(1) Rulemaking proceeding required

Within 120 days after December 20, 1991, the Commission shall initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object. The proceeding shall—

(A) compare and evaluate alternative methods and procedures (including the use of electronic databases, telephone network technologies, special directory markings, industry-based or company-specific "do not call" systems, and any other alternatives, individually or in combination) for their effectiveness in protecting such privacy rights, and in terms of their cost and other advantages and disadvantages;

(B) evaluate the categories of public and private entities that would have the capacity to establish and administer such methods and procedures;

(C) consider whether different methods and procedures may apply for local telephone solicitations, such as local telephone solicitations of small businesses or holders of second class mail permits;

(D) consider whether there is a need for additional Commission authority to further restrict telephone solicitations, including those calls exempted under subsection (a)(3) of this section, and, if such a finding is made and supported by the record, propose specific restrictions to the Congress; and

(E) develop proposed regulations to implement the methods and procedures that the Commission determines are most effective and efficient to accomplish the purposes of this section.

(2) Regulations

Not later than 9 months after December 20, 1991, the Commission shall conclude the rulemaking proceeding initiated under paragraph (1) and shall prescribe regulations to implement methods and procedures for protecting the privacy rights described in such paragraph in an efficient, effective, and economic manner and without the imposition of any additional charge to telephone subscribers.

(3) Use of database permitted

The regulations required by paragraph (2) may require the establishment and operation of a single national database to compile a list of telephone numbers of residential subscribers who object to receiving telephone solicitations, and to make that compiled list and

parts thereof available for purchase. If the Commission determines to require such a database, such regulations shall—

(A) specify a method by which the Commission will select an entity to administer such database;

(B) require each common carrier providing telephone exchange service, in accordance with regulations prescribed by the Commission, to inform subscribers for telephone exchange service of the opportunity to provide notification, in accordance with regulations established under this paragraph, that such subscriber objects to receiving telephone solicitations;

(C) specify the methods by which each telephone subscriber shall be informed, by the common carrier that provides local exchange service to that subscriber, of (i) the subscriber's right to give or revoke a notification of an objection under subparagraph (A), and (ii) the methods by which such right may be exercised by the subscriber;

(D) specify the methods by which such objections shall be collected and added to the database;

(E) prohibit any residential subscriber from being charged for giving or revoking such notification or for being included in a database compiled under this section;

(F) prohibit any person from making or transmitting a telephone solicitation to the telephone number of any subscriber included in such database;

(G) specify (i) the methods by which any person desiring to make or transmit telephone solicitations will obtain access to the database, by area code or local exchange prefix, as required to avoid calling the telephone numbers of subscribers included in

such database; and (ii) the costs to be recovered from such persons;

(H) specify the methods for recovering, from persons accessing such database, the costs involved in identifying, collecting, updating, disseminating, and selling, and other activities relating to, the operations of the database that are incurred by the entities carrying out those activities;

(I) specify the frequency with which such database will be updated and specify the method by which such updating will take effect for purposes of compliance with the regulations prescribed under this subsection;

(J) be designed to enable States to use the database mechanism selected by the Commission for purposes of administering or enforcing State law;

(K) prohibit the use of such database for any purpose other than compliance with the requirements of this section and any such State law and specify methods for protection of the privacy rights of persons whose numbers are included in such database; and

(L) require each common carrier providing services to any person for the purpose of making telephone solicitations to notify such person of the requirements of this section and the regulations thereunder.

(4) Considerations required for use of database method

If the Commission determines to require the database mechanism described in paragraph (3), the Commission shall—

(A) in developing procedures for gaining access to the database, consider the different needs of telemarketers conducting business on a national, regional, State, or local level;

(B) develop a fee schedule or price structure for recouping the cost of such database that recognizes such differences and—

(i) reflect the relative costs of providing a national, regional, State, or local list of phone numbers of subscribers who object to receiving telephone solicitations;

(ii) reflect the relative costs of providing such lists on paper or electronic media; and

(iii) not place an unreasonable financial burden on small businesses; and

(C) consider (i) whether the needs of telemarketers operating on a local basis could be met through special markings of area white pages directories, and (ii) if such directories are needed as an adjunct to database lists prepared by area code and local exchange prefix.

(5) Private right of action

A person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may, if otherwise permitted by the laws or rules of court of a State bring in an appropriate court of that State—

(A) an action based on a violation of the regulations prescribed under this subsection to enjoin such violation,

(B) an action to recover for actual monetary loss from such a violation, or to receive up to $500 in damages for each such violation, whichever is greater, or

(C) both such actions.

It shall be an affirmative defense in any action brought under this paragraph that the defendant has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection. If the court finds that the defendant willfully or knowingly violated the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

(6) Relation to subsection (b)

The provisions of this subsection shall not be construed to permit a communication prohibited by subsection (b) of this section.

(d) Technical and procedural standards

(1) Prohibition

It shall be unlawful for any person within the United States—

(A) to initiate any communication using a telephone facsimile machine, or to make any telephone call using any automatic telephone dialing system, that does not comply with the technical and procedural standards prescribed under this subsection, or to use any telephone facsimile machine or automatic telephone dialing system in a manner that does not comply with such standards; or

(B) to use a computer or other electronic device to send any message via a telephone facsimile machine unless such person clearly marks, in a margin at the top or bottom of each transmitted page of the message or on the first page of the transmission, the date and time it is sent and an identification of the business, other entity, or individual sending the message and the telephone number of the sending machine or of such business, other entity, or individual.

(2) Telephone facsimile machines

The Commission shall revise the regulations setting technical and procedural standards for telephone facsimile machines to require that any such machine which is manufactured after one year after December 20, 1991, clearly marks, in a margin at the top or bottom of each transmitted page or on the first page of each transmission, the date and time sent, an identification of the business, other entity, or individual sending the message, and the telephone number of the sending machine or of such business, other entity, or individual.

(3) Artificial or prerecorded voice systems

The Commission shall prescribe technical and procedural standards for systems that are used to transmit any artificial or prerecorded voice message via telephone. Such standards shall require that—

(A) all artificial or prerecorded telephone messages (i) shall, at the beginning of the message, state clearly the identity of the business, individual, or other entity initiating the call, and (ii) shall, during or after the message, state clearly the telephone number or address of such business, other entity, or individual; and

(B) any such system will automatically release the called party's line within 5 seconds of the time notification is transmitted to the system that the called party has hung up, to allow the called party's line to be used to make or receive other calls.

(e) Prohibition on provision of inaccurate caller identification information

(1) In general

It shall be unlawful for any person within the United States, in connection with any telecommunications service or IP-enabled voice service, to cause any caller identification service to knowingly transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value, unless such transmission is exempted pursuant to paragraph (3)(B).

(2) Protection for blocking caller identification information

Nothing in this subsection may be construed to prevent or restrict any person from blocking the capability of any caller identification service to transmit caller identification information.

(3) Regulations

(A) In general

Not later than 6 months after December 22, 2010, the Commission shall prescribe regulations to implement this subsection.

(B) Content of regulations

(i) In general

The regulations required under subparagraph (A) shall include such exemptions from the prohibition under paragraph (1) as the Commission determines is appropriate.

(ii) Specific exemption for law enforcement agencies or court orders

The regulations required under subparagraph (A) shall exempt from the prohibition under paragraph (1) transmissions in connection with—

(I) any authorized activity of a law enforcement agency; or

(II) a court order that specifically authorizes the use of caller identification manipulation.

(4) Repealed. Pub.L. 115-141, Div. P, Title IV, § 402(i)(3), Mar. 23, 2018, 132 Stat. 1089

(5) Penalties

(A) Civil forfeiture

(i) In general

Any person that is determined by the Commission, in accordance with paragraphs (3) and (4) of section 503(b) of this title, to have violated this subsection shall be liable to the United States for a forfeiture penalty. A forfeiture penalty under this paragraph shall be in addition to any other penalty provided for by this chapter. The amount of the forfeiture penalty determined under this paragraph shall not exceed $10,000 for each violation, or 3 times that amount for each day of a continuing violation, except that the amount assessed for

any continuing violation shall not exceed a total of $1,000,000 for any single act or failure to act.

(ii) Recovery

Any forfeiture penalty determined under clause (i) shall be recoverable pursuant to section 504(a) of this title.

(iii) Procedure

No forfeiture liability shall be determined under clause (i) against any person unless such person receives the notice required by section 503(b)(3)of this title or section 503(b)(4) of this title.

(iv) 2-year statute of limitations

No forfeiture penalty shall be determined or imposed against any person under clause (i) if the violation charged occurred more than 2 years prior to the date of issuance of the required notice or notice or apparent liability.

(B) Criminal fine

Any person who willfully and knowingly violates this subsection shall upon conviction thereof be fined not more than $10,000 for each violation, or 3 times that amount for each day of a continuing violation, in lieu of the fine provided by section 501 of this title for such a violation. This subparagraph does not supersede the provisions of section 501 of this title relating to imprisonment or the imposition of a penalty of both fine and imprisonment.

(6) Enforcement by States

(A) In general

The chief legal officer of a State, or any other State officer authorized by law to bring actions on behalf of the residents of a State, may bring a civil action, as parens patriae, on behalf of the residents of that State in an appropriate district court of the United States to enforce this subsection or to impose the civil penalties for violation of this subsection, whenever the chief legal officer or other State officer has reason to believe that the interests of the residents of the State have been or are being threatened or adversely affected by a violation of this subsection or a regulation under this subsection.

(B) Notice

The chief legal officer or other State officer shall serve written notice on the Commission of any civil action under subparagraph (A) prior to initiating such civil action. The notice shall include a copy of the complaint to be filed to initiate such civil action, except that if it is not feasible for the State to provide such prior notice, the State shall provide such notice immediately upon instituting such civil action.

(C) Authority to intervene

Upon receiving the notice required by subparagraph (B), the Commission shall have the right—

   (i) to intervene in the action;

   (ii) upon so intervening, to be heard on all matters arising therein; and

   (iii) to file petitions for appeal.

(D) Construction

For purposes of bringing any civil action under subparagraph (A), nothing in this paragraph shall prevent the chief legal officer or other State officer from exercising the powers conferred on that officer by the laws of such State to conduct investigations or to administer oaths or affirmations or to compel the attendance of witnesses or the production of documentary and other evidence.

(E) Venue; service or process

(i) Venue

An action brought under subparagraph (A) shall be brought in a district court of the United States that meets applicable requirements relating to venue under section 1391 of Title 28.

(ii) Service of process

In an action brought under subparagraph (A)—

(I) process may be served without regard to the territorial limits of the district or of the State in which the action is instituted; and

(II) a person who participated in an alleged violation that is being litigated in the civil action may be joined in the civil action without regard to the residence of the person.

(7) Effect on other laws

This subsection does not prohibit any lawfully authorized investigative, protective, or intelligence activity of a law enforcement agency of the United States, a State, or a political subdivision of a State, or of an intelligence agency of the United States.

(8) Definitions

For purposes of this subsection:

(A) Caller identification information

The term "caller identification information" means information provided by a caller identification service regarding the telephone number of, or other information regarding the origination of, a call made using a telecommunications service or IP-enabled voice service.

(B) Caller identification service

The term "caller identification service" means any service or device designed to provide the user of the service or device with the telephone number of, or other information regarding the origination of, a call made using a telecommunications service or IP-enabled voice service. Such term includes automatic number identification services.

(C) IP-enabled voice service

The term "IP-enabled voice service" has the meaning given that term by section 9.3 of the Commission's regulations (47 C.F.R. 9.3), as those regulations may be amended by the Commission from time to time.

(9) Limitation

Notwithstanding any other provision of this section, subsection (f) shall not apply to this subsection or to the regulations under this subsection.

(f) Effect on State law

(1) State law not preempted

Except for the standards prescribed under subsection (d) of this section and subject to paragraph (2) of this subsection, nothing in this section or in the regulations prescribed under this section shall preempt any State law that imposes more restrictive intrastate requirements or regulations on, or which prohibits—

    (A) the use of telephone facsimile machines or other electronic devices to send unsolicited advertisements;

    (B) the use of automatic telephone dialing systems;

    (C) the use of artificial or prerecorded voice messages; or

    (D) the making of telephone solicitations.

(2) State use of databases

If, pursuant to subsection (c)(3) of this section, the Commission requires the establishment of a single national database of telephone numbers of subscribers who object to receiving telephone solicitations, a State or local authority may not, in its regulation of telephone solicitations, require the use of any database, list, or listing system that does not include the part of such single national database that relates to such State.

(g) Actions by States

(1) Authority of States

Whenever the attorney general of a State, or an official or agency designated by a State, has reason to believe that any person has engaged or is engaging in a pattern or practice of telephone calls or other transmissions to residents of that State in violation of this section or the regulations prescribed under this section, the State may bring a civil action on behalf of its residents to enjoin such calls,

an action to recover for actual monetary loss or receive $500 in damages for each violation, or both such actions. If the court finds the defendant willfully or knowingly violated such regulations, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under the preceding sentence.

(2) Exclusive jurisdiction of Federal courts

The district courts of the United States, the United States courts of any territory, and the District Court of the United States for the District of Columbia shall have exclusive jurisdiction over all civil actions brought under this subsection. Upon proper application, such courts shall also have jurisdiction to issue writs of mandamus, or orders affording like relief, commanding the defendant to comply with the provisions of this section or regulations prescribed under this section, including the requirement that the defendant take such action as is necessary to remove the danger of such violation. Upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond.

(3) Rights of Commission

The State shall serve prior written notice of any such civil action upon the Commission and provide the Commission with a copy of its complaint, except in any case where such prior notice is not feasible, in which case the State shall serve such notice immediately upon instituting such action. The Commission shall have the right (A) to intervene in the action, (B) upon so intervening, to be heard on all matters arising therein, and (C) to file petitions for appeal.

(4) Venue; service of process

Any civil action brought under this subsection in a district court of the United States may be brought in the district wherein the defendant is found or is an inhabitant or transacts business or wherein the violation occurred or is occurring, and process in such cases may be served in any district in which the defendant is an inhabitant or where the defendant may be found.

(5) Investigatory powers

For purposes of bringing any civil action under this subsection, nothing in this section shall prevent the attorney general of a State, or an official or agency designated by a State, from exercising the powers conferred on the attorney general or such official by the laws of such State to conduct investigations or to administer oaths or affirmations or to compel the attendance of witnesses or the production of documentary and other evidence.

(6) Effect on State court proceedings

Nothing contained in this subsection shall be construed to prohibit an authorized State official from proceeding in State court on the basis of an alleged violation of any general civil or criminal statute of such State.

(7) Limitation

Whenever the Commission has instituted a civil action for violation of regulations prescribed under this section, no State may, during the pendency of such action instituted by the Commission, subsequently institute a civil action against any defendant named in the Commission's complaint for any violation as alleged in the Commission's complaint.

(8) "Attorney general" defined

As used in this subsection, the term "attorney general" means the chief legal officer of a State.

(h) Junk Fax Enforcement report

The Commission shall submit an annual report to Congress regarding the enforcement during the past year of the provisions of this section relating to sending of unsolicited advertisements to telephone facsimile machines, which report shall include—

(1) the number of complaints received by the Commission during such year alleging that a consumer received an unsolicited advertisement via telephone facsimile machine in violation of the Commission's rules;

(2) the number of citations issued by the Commission pursuant to section 503 of this title during the year to enforce any law, regulation, or policy relating to sending of unsolicited advertisements to telephone facsimile machines;

(3) the number of notices of apparent liability issued by the Commission pursuant to section 503 of this title during the year to enforce any law, regulation, or policy relating to sending of unsolicited advertisements to telephone facsimile machines;

(4) for each notice referred to in paragraph (3)—

(A) the amount of the proposed forfeiture penalty involved;

(B) the person to whom the notice was issued;

(C) the length of time between the date on which the complaint was filed and the date on which the notice was issued; and

(D) the status of the proceeding;

(5) the number of final orders imposing forfeiture penalties issued pursuant to section 503 of this title during the year to enforce any law, regulation, or policy relating to sending of unsolicited advertisements to telephone facsimile machines;

(6) for each forfeiture order referred to in paragraph (5) —

    (A) the amount of the penalty imposed by the order;

    (B) the person to whom the order was issued;

    (C) whether the forfeiture penalty has been paid; and

    (D) the amount paid;

(7) for each case in which a person has failed to pay a forfeiture penalty imposed by such a final order, whether the Commission referred such matter for recovery of the penalty; and

(8) for each case in which the Commission referred such an order for recovery—

    (A) the number of days from the date the Commission issued such order to the date of such referral;

    (B) whether an action has been commenced to recover the penalty, and if so, the number of days from the date the Commission referred such order for recovery to the date of such commencement; and

    (C) whether the recovery action resulted in collection of any amount, and if so, the amount collected.

**47 C.F.R. § 64.1100 Definitions.**

(a) The term *submitting carrier* is generally any telecommunications carrier that requests on the behalf of a subscriber that the subscriber's telecommunications carrier be changed, and seeks to provide retail services to the end user subscriber. A carrier may be treated as a submitting carrier, however, if it is responsible for any unreasonable delays in the submission of carrier change requests or for the submission of unauthorized carrier change requests, including fraudulent authorizations.

(b) The term *executing carrier* is generally any telecommunications carrier that effects a request that a subscriber's telecommunications carrier be changed. A carrier may be treated as an executing carrier, however, if it is responsible for any unreasonable delays in the execution of carrier changes or for the execution of unauthorized carrier changes, including fraudulent authorizations.

(c) The term *authorized carrier* is generally any telecommunications carrier that submits a change, on behalf of a subscriber, in the subscriber's selection of a provider of telecommunications service with the subscriber's authorization verified in accordance with the procedures specified in this part.

(d) The term *unauthorized carrier* is generally any telecommunications carrier that submits a change, on behalf of a subscriber, in the subscriber's selection of a provider of telecommunications service but fails to obtain the subscriber's authorization verified in accordance with the procedures specified in this part.

(e) The term *unauthorized change* is a change in a subscriber's selection of a provider of telecommunications service that was made without authorization verified in accordance with the verification procedures specified in this part.

(f) The term *state commission* shall include any state entity with the state-designated authority to resolve the complaints of such state's residents arising out of an allegation that an unauthorized change of a telecommunication service provider has occurred that has elected, in accordance with the requirements of § 64.1110(a), to administer the Federal Communications Commission's slamming rules and remedies, as enumerated in §§ 64.1100 through 64.1190.

(g) The term *relevant governmental agency* shall be the state commission if the complainant files a complaint with the state commission or if the complaint is forwarded to the state commission by the Federal Communications Commission, and the Federal Communications Commission if the complainant files a complaint with the Federal Communications Commission, and the complaint is not forwarded to a state commission.

(h) The term *subscriber* is any one of the following:

(1) The party identified in the account records of a common carrier as responsible for payment of the telephone bill;

(2) Any adult person authorized by such party to change telecommunications services or to charge services to the account; or

(3) Any person contractually or otherwise lawfully authorized to represent such party.

**47 C.F.R. § 64.1200 Delivery restrictions.**

(a) No person or entity may:

(1) Except as provided in paragraph (a)(2) of this section, initiate any telephone call (other than a call made for emergency purposes or is made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice;

(i) To any emergency telephone line, including any 911 line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency;

(ii) To the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or

(iii) To any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call.

(iv) A person will not be liable for violating the prohibition in paragraph (a)(1)(iii) of this section when the call is placed to a wireless number that has been ported from wireline service and such call is a voice call; not knowingly made to a wireless number; and made within 15 days of the porting of the number from wireline to wireless service, provided the number is not already on the national do-not-call registry or caller's company-specific do-not-call list.

(2) Initiate, or cause to be initiated, any telephone call that includes or introduces an advertisement or constitutes telemarketing, using

an automatic telephone dialing system or an artificial or prerecorded voice, to any of the lines or telephone numbers described in paragraphs (a)(1)(i) through (iii) of this section, other than a call made with the prior express written consent of the called party or the prior express consent of the called party when the call is made by or on behalf of a tax-exempt nonprofit organization, or a call that delivers a "health care" message made by, or on behalf of, a "covered entity" or its "business associate," as those terms are defined in the HIPAA Privacy Rule, 45 CFR 160.103.

(3) Initiate any telephone call to any residential line using an artificial or prerecorded voice to deliver a message without the prior express written consent of the called party, unless the call;

  (i) Is made for emergency purposes;

  (ii) Is not made for a commercial purpose;

  (iii) Is made for a commercial purpose but does not include or introduce an advertisement or constitute telemarketing;

  (iv) Is made by or on behalf of a tax-exempt nonprofit organization; or

  (v) Delivers a "health care" message made by, or on behalf of, a "covered entity" or its "business associate," as those terms are defined in the HIPAA Privacy Rule, 45 CFR 160.103.

(4) Use a telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine, unless—

  (i) The unsolicited advertisement is from a sender with an established business relationship, as defined in paragraph (f)(6) of this section, with the recipient; and

(ii) The sender obtained the number of the telephone facsimile machine through—

(A) The voluntary communication of such number by the recipient directly to the sender, within the context of such established business relationship; or

(B) A directory, advertisement, or site on the Internet to which the recipient voluntarily agreed to make available its facsimile number for public distribution. If a sender obtains the facsimile number from the recipient's own directory, advertisement, or Internet site, it will be presumed that the number was voluntarily made available for public distribution, unless such materials explicitly note that unsolicited advertisements are not accepted at the specified facsimile number. If a sender obtains the facsimile number from other sources, the sender must take reasonable steps to verify that the recipient agreed to make the number available for public distribution.

(C) This clause shall not apply in the case of an unsolicited advertisement that is sent based on an established business relationship with the recipient that was in existence before July 9, 2005 if the sender also possessed the facsimile machine number of the recipient before July 9, 2005. There shall be a rebuttable presumption that if a valid established business relationship was formed prior to July 9, 2005, the sender possessed the facsimile number prior to such date as well; and

(iii) The advertisement contains a notice that informs the recipient of the ability and means to avoid future unsolicited advertisements. A notice contained in an advertisement complies with the requirements under this paragraph only if—

(A) The notice is clear and conspicuous and on the first page of the advertisement;

(B) The notice states that the recipient may make a request to the sender of the advertisement not to send any future advertisements to a telephone facsimile machine or machines and that failure to comply, within 30 days, with such a request meeting the requirements under paragraph (a)(4)(v) of this section is unlawful;

(C) The notice sets forth the requirements for an opt-out request under paragraph (a)(4)(v) of this section;

(D) The notice includes—

*(1)* A domestic contact telephone number and facsimile machine number for the recipient to transmit such a request to the sender; and

*(2)* If neither the required telephone number nor facsimile machine number is a toll-free number, a separate cost-free mechanism including a Web site address or email address, for a recipient to transmit a request pursuant to such notice to the sender of the advertisement. A local telephone number also shall constitute a cost-free mechanism so long as recipients are local and will not incur any long distance or other separate charges for calls made to such number; and

(E) The telephone and facsimile numbers and cost-free mechanism identified in the notice must permit an individual or business to make an opt-out request 24 hours a day, 7 days a week.

(iv) A facsimile advertisement that is sent to a recipient that has provided prior express invitation or permission to the sender must

include an opt-out notice that complies with the requirements in paragraph (a)(4)(iii) of this section.

(v) A request not to send future unsolicited advertisements to a telephone facsimile machine complies with the requirements under this subparagraph only if—

(A) The request identifies the telephone number or numbers of the telephone facsimile machine or machines to which the request relates;

(B) The request is made to the telephone number, facsimile number, Web site address or email address identified in the sender's facsimile advertisement; and

(C) The person making the request has not, subsequent to such request, provided express invitation or permission to the sender, in writing or otherwise, to send such advertisements to such person at such telephone facsimile machine.

(vi) A sender that receives a request not to send future unsolicited advertisements that complies with paragraph (a)(4)(v) of this section must honor that request within the shortest reasonable time from the date of such request, not to exceed 30 days, and is prohibited from sending unsolicited advertisements to the recipient unless the recipient subsequently provides prior express invitation or permission to the sender. The recipient's opt-out request terminates the established business relationship exemption for purposes of sending future unsolicited advertisements. If such requests are recorded or maintained by a party other than the sender on whose behalf the unsolicited advertisement is sent, the sender will be liable for any failures to honor the opt-out request.

(vii) A facsimile broadcaster will be liable for violations of paragraph (a)(4) of this section, including the inclusion of opt-out notices on unsolicited advertisements, if it demonstrates a high degree of involvement in, or actual notice of, the unlawful activity and fails to take steps to prevent such facsimile transmissions.

(5) Use an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are engaged simultaneously.

(6) Disconnect an unanswered telemarketing call prior to at least 15 seconds or four (4) rings.

(7) Abandon more than three percent of all telemarketing calls that are answered live by a person, as measured over a 30–day period for a single calling campaign. If a single calling campaign exceeds a 30–day period, the abandonment rate shall be calculated separately for each successive 30–day period or portion thereof that such calling campaign continues. A call is "abandoned" if it is not connected to a live sales representative within two (2) seconds of the called person's completed greeting.

(i) Whenever a live sales representative is not available to speak with the person answering the call, within two (2) seconds after the called person's completed greeting, the telemarketer or the seller must provide:

(A) A prerecorded identification and opt-out message that is limited to disclosing that the call was for "telemarketing purposes" and states the name of the business, entity, or individual on whose behalf the call was placed, and a telephone number for such business, entity, or individual that permits the called person to make a do-not-call request during regular business hours for the duration of the telemarketing campaign;

provided, that, such telephone number may not be a 900 number or any other number for which charges exceed local or long distance transmission charges, and

(B) An automated, interactive voice- and/or key press-activated opt-out mechanism that enables the called person to make a do-not-call request prior to terminating the call, including brief explanatory instructions on how to use such mechanism. When the called person elects to opt-out using such mechanism, the mechanism must automatically record the called person's number to the seller's do-not-call list and immediately terminate the call.

(ii) A call for telemarketing purposes that delivers an artificial or prerecorded voice message to a residential telephone line or to any of the lines or telephone numbers described in paragraphs (a)(1)(i) through (iii) of this section after the subscriber to such line has granted prior express written consent for the call to be made shall not be considered an abandoned call if the message begins within two (2) seconds of the called person's completed greeting.

(iii) The seller or telemarketer must maintain records establishing compliance with paragraph (a)(7) of this section.

(iv) Calls made by or on behalf of tax-exempt nonprofit organizations are not covered by this paragraph (a)(7).

(8) Use any technology to dial any telephone number for the purpose of determining whether the line is a facsimile or voice line.

(b) All artificial or prerecorded voice telephone messages shall:

(1) At the beginning of the message, state clearly the identity of the business, individual, or other entity that is responsible for initiating the call. If a business is responsible for initiating the call, the name

under which the entity is registered to conduct business with the State Corporation Commission (or comparable regulatory authority) must be stated;

(2) During or after the message, state clearly the telephone number (other than that of the autodialer or prerecorded message player that placed the call) of such business, other entity, or individual. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges. For telemarketing messages to residential telephone subscribers, such telephone number must permit any individual to make a do-not-call request during regular business hours for the duration of the telemarketing campaign; and

(3) In every case where the artificial or prerecorded voice telephone message includes or introduces an advertisement or constitutes telemarketing and is delivered to a residential telephone line or any of the lines or telephone numbers described in paragraphs (a)(1)(i) through (iii), provide an automated, interactive voice- and/or key press-activated opt-out mechanism for the called person to make a do-not-call request, including brief explanatory instructions on how to use such mechanism, within two (2) seconds of providing the identification information required in paragraph (b)(1) of this section. When the called person elects to opt out using such mechanism, the mechanism, must automatically record the called person's number to the seller's do-not-call list and immediately terminate the call. When the artificial or prerecorded voice telephone message is left on an answering machine or a voice mail service, such message must also provide a toll free number that enables the called person to call back at a later time and connect directly to the automated, interactive voice- and/or key press-activated opt-out mechanism and automatically record the called person's number to the seller's do-not-call list.

(c) No person or entity shall initiate any telephone solicitation to:

(1) Any residential telephone subscriber before the hour of 8 a.m. or after 9 p.m. (local time at the called party's location), or

(2) A residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government. Such do-not-call registrations must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator. Any person or entity making telephone solicitations (or on whose behalf telephone solicitations are made) will not be liable for violating this requirement if:

(i) It can demonstrate that the violation is the result of error and that as part of its routine business practice, it meets the following standards:

(A) Written procedures. It has established and implemented written procedures to comply with the national do-not-call rules;

(B) Training of personnel. It has trained its personnel, and any entity assisting in its compliance, in procedures established pursuant to the national do-not-call rules;

(C) Recording. It has maintained and recorded a list of telephone numbers that the seller may not contact;

(D) Accessing the national do-not-call database. It uses a process to prevent telephone solicitations to any telephone number on any list established pursuant to the do-not-call rules, employing a version of the national do-not-call registry obtained from the administrator of the registry no more than

31 days prior to the date any call is made, and maintains records documenting this process.

Note to paragraph (c)(2)(i)(D): The requirement in paragraph 64.1200(c)(2)(i)(D) for persons or entities to employ a version of the national do-not-call registry obtained from the administrator no more than 31 days prior to the date any call is made is effective January 1, 2005. Until January 1, 2005, persons or entities must continue to employ a version of the registry obtained from the administrator of the registry no more than three months prior to the date any call is made.

(E) Purchasing the national do-not-call database. It uses a process to ensure that it does not sell, rent, lease, purchase or use the national do-not-call database, or any part thereof, for any purpose except compliance with this section and any such state or federal law to prevent telephone solicitations to telephone numbers registered on the national database. It purchases access to the relevant do-not-call data from the administrator of the national database and does not participate in any arrangement to share the cost of accessing the national database, including any arrangement with telemarketers who may not divide the costs to access the national database among various client sellers; or

(ii) It has obtained the subscriber's prior express invitation or permission. Such permission must be evidenced by a signed, written agreement between the consumer and seller which states that the consumer agrees to be contacted by this seller and includes the telephone number to which the calls may be placed; or

(iii) The telemarketer making the call has a personal relationship with the recipient of the call.

ADD38

(d) No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:

(1) *Written policy*. Persons or entities making calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.

(2) *Training of personnel engaged in telemarketing*. Personnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.

(3) *Recording, disclosure of do-not-call requests*. If a person or entity making a call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. Persons or entities making calls for telemarketing purposes (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. This period may not exceed thirty days from the date of such request. If such requests are recorded or maintained by a party other than the person or entity on whose behalf the telemarketing call is made, the person or entity on whose behalf the telemarketing call is made will be liable for any failures to honor the do-not-call request. A person or entity making a call for telemarketing purposes must obtain a consumer's prior express permission to share or forward the consumer's request not to

be called to a party other than the person or entity on whose behalf a telemarketing call is made or an affiliated entity.

(4) *Identification of sellers and telemarketers.* A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges.

(5) *Affiliated persons or entities.* In the absence of a specific request by the subscriber to the contrary, a residential subscriber's do-not-call request shall apply to the particular business entity making the call (or on whose behalf a call is made), and will not apply to affiliated entities unless the consumer reasonably would expect them to be included given the identification of the caller and the product being advertised.

(6) *Maintenance of do-not-call lists.* A person or entity making calls for telemarketing purposes must maintain a record of a consumer's request not to receive further telemarketing calls. A do-not-call request must be honored for 5 years from the time the request is made.

(7) Tax-exempt nonprofit organizations are not required to comply with 64.1200(d).

(e) The rules set forth in paragraph (c) and (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers to the extent described in the Commission's Report and Order, CG Docket No. 02–

278, FCC 03–153, "Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991."

(f) As used in this section:

(1) The term *advertisement* means any material advertising the commercial availability or quality of any property, goods, or services.

(2) The terms *automatic telephone dialing system* and *autodialer* mean equipment which has the capacity to store or produce telephone numbers to be called using a random or sequential number generator and to dial such numbers.

(3) The term *clear and conspicuous* means a notice that would be apparent to the reasonable consumer, separate and distinguishable from the advertising copy or other disclosures. With respect to facsimiles and for purposes of paragraph (a)(4)(iii)(A) of this section, the notice must be placed at either the top or bottom of the facsimile.

(4) The term *emergency purposes* means calls made necessary in any situation affecting the health and safety of consumers.

(5) The term *established business relationship* for purposes of telephone solicitations means a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of the subscriber's purchase or transaction with the entity within the eighteen (18) months immediately preceding the date of the telephone call or on the basis of the subscriber's inquiry or application regarding products or services offered by the entity within the three months immediately preceding the date of the call, which relationship has not been previously terminated by either party.

(i) The subscriber's seller-specific do-not-call request, as set forth in paragraph (d)(3) of this section, terminates an established business relationship for purposes of telemarketing and telephone solicitation even if the subscriber continues to do business with the seller.

(ii) The subscriber's established business relationship with a particular business entity does not extend to affiliated entities unless the subscriber would reasonably expect them to be included given the nature and type of goods or services offered by the affiliate and the identity of the affiliate.

(6) The term *established business relationship* for purposes of paragraph (a)(4) of this section on the sending of facsimile advertisements means a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a business or residential subscriber with or without an exchange of consideration, on the basis of an inquiry, application, purchase or transaction by the business or residential subscriber regarding products or services offered by such person or entity, which relationship has not been previously terminated by either party.

(7) The term *facsimile broadcaster* means a person or entity that transmits messages to telephone facsimile machines on behalf of another person or entity for a fee.

(8) The term *prior express written consent* means an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.

(i) The written agreement shall include a clear and conspicuous disclosure informing the person signing that:

    (A) By executing the agreement, such person authorizes the seller to deliver or cause to be delivered to the signatory telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice; and

    (B) The person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services.

(ii) The term "signature" shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

(9) The term *seller* means the person or entity on whose behalf a telephone call or message is initiated for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person.

(10) The term *sender* for purposes of paragraph (a)(4) of this section means the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement.

(11) The term *telemarketer* means the person or entity that initiates a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person.

(12) The term *telemarketing* means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of,

or investment in, property, goods, or services, which is transmitted to any person.

(13) The term *telephone facsimile machine* means equipment which has the capacity to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper.

(14) The term *telephone solicitation* means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person, but such term does not include a call or message:

> (i) To any person with that person's prior express invitation or permission;

> (ii) To any person with whom the caller has an established business relationship; or

> (iii) By or on behalf of a tax-exempt nonprofit organization.

(15) The term *unsolicited advertisement* means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise.

(16) The term *personal relationship* means any family member, friend, or acquaintance of the telemarketer making the call.

(g) Beginning January 1, 2004, common carriers shall:

(1) When providing local exchange service, provide an annual notice, via an insert in the subscriber's bill, of the right to give or revoke a notification of an objection to receiving telephone solicitations pursuant to the national do-not-call database maintained by the federal government and the methods by which such rights may be exercised by the subscriber. The notice must be clear and conspicuous and include, at a minimum, the Internet address and toll-free number that residential telephone subscribers may use to register on the national database.

(2) When providing service to any person or entity for the purpose of making telephone solicitations, make a one-time notification to such person or entity of the national do-not-call requirements, including, at a minimum, citation to 47 CFR 64.1200 and 16 CFR 310. Failure to receive such notification will not serve as a defense to any person or entity making telephone solicitations from violations of this section.

(h) The administrator of the national do-not-call registry that is maintained by the federal government shall make the telephone numbers in the database available to the States so that a State may use the telephone numbers that relate to such State as part of any database, list or listing system maintained by such State for the regulation of telephone solicitations.

(i) [Reserved]

(j) [Reserved]

(k) Voice service providers may block calls so that they do not reach a called party as follows:

(1) A provider may block a voice call when the subscriber to which the originating number is assigned has requested that calls

purporting to originate from that number be blocked because the number is used for inbound calls only.

(2) A provider may block a voice call purporting to originate from any of the following:

(i) A North American Numbering Plan number that is not valid;

(ii) A valid North American Numbering Plan number that is not allocated to a provider by the North American Numbering Plan Administrator or the Pooling Administrator; and

(iii) A valid North American Numbering Plan number that is allocated to a provider by the North American Numbering Plan Administrator or Pooling Administrator, but is unused, so long as the provider blocking the calls is the allocatee of the number and confirms that the number is unused or has obtained verification from the allocatee that the number is unused at the time of the blocking.

(3) A provider may not block a voice call under paragraph (k)(1) or (2) of this section if the call is an emergency call placed to 911.

(4) For purposes of this subsection, a provider may rely on Caller ID information to determine the purported originating number without regard to whether the call in fact originated from that number.

**47 C.F.R. § 64.1200 (1993) Delivery restrictions.**

(a) No person may:

(1) Initiate any telephone call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice,

(i) To any emergency telephone line, including any 911 line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency;

(ii) To the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or

(iii) To any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call;

(2) Initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes or is exempted by § 64.1200(c) of this section.

(3) Use a telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine.

(4) Use an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are engaged simultaneously.

(b) For the purpose of § 64.1200(a) of this section, the term *emergency purposes* means calls made necessary in any situation affecting the health and safety of consumers.

(c) The term *telephone call* in § 64.1200(a)(2) of this section shall not include a call or message by, or on behalf of, a caller:

(1) That is not made for a commercial purpose,

(2) That is made for a commercial purpose but does not include the transmission of any unsolicited advertisement,

(3) To any person with whom the caller has an established business relationship at the time the call is made, or

(4) Which is a tax-exempt nonprofit organization.

(d) All artificial or prerecorded telephone messages delivered by an automatic telephone dialing system shall:

(1) At the beginning of the message, state clearly the identity of the business, individual, or other entity initiating the call, and

(2) During or after the message, state clearly the telephone number (other than that of the autodialer or prerecorded message player which placed the call) or address of such business, other entity, or individual.

(e) No person or entity shall initiate any telephone solicitation to a residential telephone subscriber:

(1) Before the hour of 8 a.m. or after 9 p.m. (local time at the called party's location), and

(2) Unless such person or entity has instituted procedures for maintaining a list of persons who do not wish to receive telephone

solicitations made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:

(i) Written policy. Persons or entities making telephone solicitations must have a written policy, available upon demand, for maintaining a do-not-call list.

(ii) Training of personnel engaged in telephone solicitation. Personnel engaged in any aspect of telephone solicitation must be informed and trained in the existence and use of the do-not-call list.

(iii) Recording, disclosure of do-not-call requests. If a person or entity making a telephone solicitation (or on whose behalf a solicitation is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name and telephone number on the do-not-call list at the time the request is made. If such requests are recorded or maintained by a party other than the person or entity on whose behalf the solicitation is made, the person or entity on whose behalf the solicitation is made will be liable for any failures to honor the do-not-call request. In order to protect the consumer's privacy, persons or entities must obtain a consumer's prior express consent to share or forward the consumer's request not to be called to a party other than the person or entity on whose behalf a solicitation is made or an affiliated entity.

(iv) Identification of telephone solicitor. A person or entity making a telephone solicitation must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or-address at which the person or entity may be contacted. If a

person or entity makes a solicitation using an artificial or prerecorded voice message transmitted by an autodialer, the person or entity must provide a telephone number other than that of the autodialer or prerecorded message player which placed the call.

(v) Affiliated persons or entities. In the absence of a specific request by the subscriber to the contrary, a residential subscriber's do-not-call request shall apply to the particular business entity making the call (or on whose behalf a call is made), and will not apply to affiliated entities unless the consumer reasonably would expect them to be included given the identification of the caller and the product being advertised.

(vi) Maintenance of do-not-call lists. A person or entity making telephone solicitations must maintain a do-not-call list for the purpose of any future telephone solicitations.

(f) As used in this section:

(1) The terms *automatic telephone dialing system* and *autodialer* mean equipment which has the capacity to store or produce telephone numbers to be called using a random or sequential number generator and to dial such numbers.

(2) The term *telephone facsimile machine* means equipment which has the capacity to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper.

(3) The term *telephone solicitation* means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services,

which is transmitted to any person, but such term does not include a call or message:

> (i) To any person with that person's prior express invitation or permission;

> (ii) To any person with whom the caller has an established business relationship; or

> (iii) By a tax-exempt nonprofit organization.

(4) The term *established business relationship* means a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of an inquiry, application, purchase or transaction by the residential subscriber regarding products or services offered by such person or entity, which relationship has not been previously terminated by either party.

(5) The term *unsolicited advertisement* means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission.

**57 Fed. Reg. 48,333**

47 CFR Parts 64 and 68

[CC Docket No. 92-90; FCC 92-443]

**Telephone Consumer Protection Act of 1991**

**AGENCY**: Federal Communications Commission.

**ACTION**: Final rule.

**SUMMARY**: This Report and Order (R&O) amends parts 64 and 68 of the Commission's rules to establish procedures for avoiding unwanted telephone solicitations to residences, and to regulate the use of automatic telephone dialing systems (autodialers), prerecorded or artificial voice messages, and telephone facsimile machines. This action is pursuant to requirements of the Telephone Consumer Protection Act of 1991 (TCPA) which amends Title II of the Communications Act of 1934, as amended, by adding new section 227 and conforming section 2(b), and results from the Commission's analysis of comments to its Notice of Proposed Rulemaking published at 7 FCC Rcd 2736 (1992), (57 FR 18445, April 30, 1992). The TCPA, and corresponding rules of the Commission, are intended to protect the public from telemarketing calls which may pose a threat to health and safety or which otherwise may be considered by the called party to be undesirable, and to establish technical and procedural standards for the use of telephone facsimile machines.

**EFFECTIVE DATE**: December 20, 1992.

**FOR FURTHER INFORMATION CONTACT**: Suzanne Hutchings, Domestic Services Branch, Domestic Facilities Division, Common Carrier Bureau, (202) 634-1802.

**SUPPLEMENTARY INFORMATION**: This summarizes the Commission's R&O in the matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 (CC Docket 92-90, FCC 92-443 adopted September 17, 1992 and released October 14, 1992). The R&O and supporting file are available for inspection and copying during the weekday hours of 9 a.m. to 4:30 p.m. in the Commission's Dockets Branch, room 239, 1919 M Street NW., Washington, DC, or copies may be purchased from the Commission's duplicating contractor, Downtown Copy Center, Inc., 1990 M Street NW., suite 640, Washington, DC 20036, phone (202) 452-1422. The R&O will be published in the FCC Record.

**Paperwork Reduction Act Statement**

The following recordkeeping requirement contained in the final rules has been submitted to the Office of Management and Budget (OMB) for review and approval pursuant to requirements of the Paperwork Reduction Act of 1980, as amended:

*Title*: Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991.

*OMB Number*: None.

*Action*: Final rules; new collection.

*Respondents*: Businesses or others for profit, including small businesses. There is no reporting requirement; however, the R&O imposes a recordkeeping requirement on telephone solicitors to maintain lists of residential telephone subscribers who do not wish to be contacted by telephone.

*Estimated Annual Burden*: The annual burden to telephone solicitors are estimated to be 30,000 recordkeepers x 260 hours per recordkeeper = 7,800,000 recordkeeping hours. The public burden for the collection of

information is estimated to average 260 hours per recordkeeper, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding burden estimates or any other aspect of the collection of information, including suggestions for reducing the burden, to the Federal Communications Commission, Paperwork Reduction Project, Records Management Division, room 416, Washington, DC 20554, and to the Office of Management and Budget, Paperwork Reduction Project, Washington, DC 20503.

## Analysis of Proceeding

This summarizes the Commission's R&O in the matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Public Law 102-243, Dec. 20, 1991 (TCPA), CC Docket 92-90, FCC 92-443, adopted September 17, 1992 and released October 16, 1992.

The TCPA adds section 227 and conforms section 2(b) to the Communications Act of 1934, as amended, to impose restrictions on the use of automatic telephone dialing systems ("autodialers"), artificial or prerecorded messages, and telephone facsimile machines. 47 U.S.C. 227 and 152(b). The TCPA also requires that the Commission consider several methods to accommodate telephone subscribers who do not wish to receive unsolicited telephonic advertisements. The statute mandates that the Commission prescribe regulations implementing its requirements within nine months after the date of enactment, December 20, 1991. Accordingly, the Commission, on April 10, 1992, adopted a Notice of Proposed Rulemaking (NPRM) (which included a copy of the TCPA) (7 FCC Rcd 2736 (1992), (57 FR 18445, April 30, 1992)) to which approximately 240 parties commented. Based on that record, the Commission has adopted this R&O.

The rules we have adopted: (1) Prohibit calls using automatic telephone dialing systems or artificial or prerecorded voice (in the absence of an emergency or the prior express consent of the called party) to emergency lines, health care facilities, radio common carriers or any number for which the called party is charged for the call; (2) prohibit calls using artificial or prerecorded voice calls to residences (absent an emergency or the prior express consent of the called party); (3) prohibit calls which transmit unsolicited advertisements to telephone facsimile machines; (4) require that telephone facsimile machines and autodialed artificial or prerecorded voice messages identify the sender of such transmissions; (5) require that artificial or prerecorded voice messages release the line of the called party within 5 seconds of notification that the called party has hung up; and (6) prohibit calls which simultaneously engage two or more lines of a multi-line business. Exemptions to the prohibition on prerecorded calls to residences apply if the call: (a) Is not made for a commercial purpose; (b) does not transmit an unsolicited advertisement; (c) is made by a calling party with whom the called party has an established business relationship; or (d) is made by a tax-exempt nonprofit organization. 47 CFR 64.1200(a)(2) and (c). In addition, telephone solicitations may not be made before the hour of 8 a.m. or after the hour of 9 p.m (local time at the called party's location). The rules further require that telephone solicitors maintain company-specific lists of residential subscribers who request not to receive further solicitations (company-specific do-not-call lists), thereby affording consumers the choice of which solicitors, if any, they will hear from by telephone. 47 CFR 64.1200(e) (iii) and (vi). The Commission believes that maintenance of such company-specific do-not-call lists, which many telemarketers already maintain, is the most effective and least costly means of preventing unwanted solicitations. Pursuant to requirements of the TCPA, the rules adopted balance the objectives of protecting consumers from nuisance calls while permitting legitimate telemarketing practices.

## Final Regulatory Flexibility Analysis

Pursuant to the Regulatory Flexibility Act of 1980, 5 U.S.C. 601, et seq., the Commission's final analysis in this R&O is as follows.

### I. Need and Purpose of This Action

This R&O amends part 64 of the Commission's rules by adding § 64.1200 to restrict the use of automatic telephone dialing systems and artificial or prerecorded voice messages for telemarketing purposes or for transmitting unsolicited telephone facsimile advertisements. The rules require that persons or entities making telephone solicitations establish procedures to protect residential subscribers from unwanted solicitations, and set forth exemptions to certain prohibitions under this part. The R&O also amends part 68 of the rules by revising § 68.318(c)(2) and adding § 68.318(c)(3) to require that automatic telephone dialing systems delivering a recorded message release the called party's line within five seconds of notification of hang up by the called party, and to require that telephone facsimile machines manufactured on and after December 21, 1992 must clearly identify the sender of a facsimile message. The amendments implement the Telephone Consumer Protection Act of 1991, which inter alia, adds section 227 to the Communications Act of 1934, as amended 47 U.S.C. 227. The rules are intended to impose reasonable restrictions on autodialed or prerecorded voice telephone calls consistent with considerations regarding public health and safety and commercial speech and trade, and to allow consumers to avoid unwanted telephone solicitations without unduly limiting legitimate telemarketing practices.

## II. Summary of Issues Raised by the Public Comments in Response to the Initial Regulatory Flexibility Analysis

No comments were submitted in direct response to the Initial Regulatory Flexibility Analysis.

## III. Significant Alternatives Considered

The NPRM in this proceeding requested comments on proposed regulations implementing the TCPA and comments on several proposals restricting telephone solicitations to residential telephone subscribers. The Commission has considered all comments and has adopted regulations to implement the prohibitions and technical requirements mandated by the TCPA as well as regulations which allow consumers to avoid unwanted telephone solicitations through placement on company-specific do-not-call lists. The Commission considers its R&O to be the most reasonable course of action under the mandate of section 227 of the Communications Act of 1934, as amended.

## Ordering Clauses

Accordingly, *it is ordered*, That, pursuant to authority contained in sections 1, 4(i), 4(j), 201-205, 218, and 227 of the Communications Act of 1934, as amended, 47 U.S.C. 151, 154(i), 154(j), 201-205, 218 and 227, parts 64 and 68 of the Commission's Rules and Regulations Are Amended as set forth below, effective December 20, 1992.

*It is further ordered*, That, the Secretary shall cause a summary of this Report and Order to be published in the **Federal Register** which shall include a statement describing how members of the public may obtain the complete text of this Commission decision. The Secretary shall also provide a copy of this Report and Order to each state utility commission.

*It is further ordered*, That, this proceeding Is Terminated.

**List of Subjects**

*47 CFR Part 64*

Telephone, Reporting and recordkeeping requirements, Consumer protection.

*47 CFR Part 68*

Telephone, Communications equipment, Facsimile. Federal Communications Commission.

**Donna R. Searcy,**

*Secretary.*

**Amended Rules**

Parts 64 and 68 of the Commission's Rules and Regulations (chapter I of title 47 of the Code of Federal Regulations, parts 64 and 68) are amended as follows:

## PART 64—MISCELLANEOUS RULES RELATING TO COMMON CARRIERS

1. The authority citation for part 64 is revised to read as follows:

Authority: Secs. 1, 4(i), 4(j), 201-5, 218, 225-7 of the Communications Act of 1934, as amended, 47 U.S.C. 151, 154(i), 154(j) 201-5, 218, 225-7.

47 CFR § 64.1200

2. New subpart L consisting of § 64.1200 is added to part 64 to read as follows:

**Subpart L—Restrictions on Telephone Solicitation**

**§ 64.1200 Delivery restrictions.**

(a) No person may:

(1) Initiate any telephone call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice,

(i) To any emergency telephone line, including any 911 line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency;

(ii) To the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or

(iii) To any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call;

(2) Initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes or is exempted by § 64.1200(c) of this section.

(3) Use a telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine.

(4) Use an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are engaged simultaneously.

(b) For the purpose of § 64.1200(a) of this section, the term "emergency purposes" means calls made necessary in any situation affecting the health and safety of consumers.

(c) The term "telephone call" in § 64.1200(a)(2) of this section shall not include a call or message by, or on behalf of, a caller:

(1) That is not made for a commercial purpose,

(2) That is made for a commercial purpose but does not include the transmission of any unsolicited advertisement,

(3) To any person with whom the caller has an established business relationship at the time the call is made, or

(4) Which is a tax-exempt nonprofit organization.

(d) All artificial or prerecorded telephone messages delivered by an automatic telephone dialing system shall:

(1) At the beginning of the message, state clearly the identity of the business, individual, or other entity initiating the call, and

(2) During or after the message, state clearly the telephone number (other than that of the autodialer or prerecorded message player which placed the call) or address of such business, other entity, or individual.

(e) No person or entity shall initiate any telephone solicitation to a residential telephone subscriber:

(1) Before the hour of 8 a.m. or after 9 p.m. (local time at the called party's location), and

(2) Unless such person or entity has instituted procedures for maintaining a list of persons who do not wish to receive telephone

solicitations made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:

(i) Written policy. Persons or entities making telephone solicitations must have a written policy, available upon demand, for maintaining a do-not-call list.

(ii) Training of personnel engaged in telephone solicitation. Personnel engaged in any aspect of telephone solicitation must be informed and trained in the existence and use of the do-not-call list.

(iii) Recording, disclosure of do-not-call requests. If a person or entity making a telephone solicitation (or on whose behalf a solicitation is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name and telephone number on the do-not-call list at the time the request is made. If such requests are recorded or maintained by a party other than the person or entity on whose behalf the solicitation is made, the person or entity on whose behalf the solicitation is made will be liable for any failures to honor the do-not-call request. In order to protect the *48336 consumer's privacy, persons or entities must obtain a consumer's consent to share or forward the consumer's request not to be called to a party other than the person or entity on whose behalf a solicitation is made or an affiliated entity.

(iv) Identification of telephone solicitor. A person or entity making a telephone solicitation must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. If a

person or entity makes a solicitation using an artificial or prerecorded voice message transmitted by an autodialer, the person or entity must provide a telephone number other than that of the autodialer or prerecorded message player which placed the call.

(v) Affiliated persons or entities. In the absence of a specific request by the subscriber to the contrary, a residential subscriber's do-not-call request shall apply to the particular business entity making the call (or on whose behalf a call is made), and will not apply to affiliated entities unless the consumer reasonably would expect them to be included given the identification of the caller and the product being advertised.

(vi) Maintenance of do-not-call lists. A person or entity making telephone solicitations must maintain a do-not-call list for the purpose of any future telephone solicitations.

(f) As used in this section:

(1) The terms "automatic telephone dialing system" and "autodialer" mean equipment which has the capacity to store or produce telephone numbers to be called using a random or sequential number generator and to dial such numbers.

(2) The term "telephone facsimile machine" means equipment which has the capacity to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper.

(3) The term "telephone solicitation" means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services,

which is transmitted to any person, but such term does not include a call or message:

> (i) To any person with that person's prior express invitation or permission;
>
> (ii) To any person with whom the caller has an established business relationship; or
>
> (iii) By a tax-exempt nonprofit organization.

(4) The term "established business relationship" means a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of an inquiry, application, purchase or transaction by the residential subscriber regarding products or services offered by such person or entity, which relationship has not been previously terminated by either party.

(5) The term "unsolicited advertisement" means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission.

## PART 68—[AMENDED]

4. The authority citation for part 68 is revised to read as follows:

Authority: Secs. 1, 4, 5, 201-5, 208, 215, 218, 226, 227, 303, 313, 314, 403, 404, 410, 602 of the Communications Act of 1934, as amended, 47 U.S.C. 151, 154, 155, 201-5, 208, 215, 218, 226, 227, 303, 313, 314, 403, 404, 410, 602.

5. Section 68.318 is amended by revising paragraph (c)(2) and adding paragraph (c)(3) to read as follows:

## § 68.318 Additional limitations.

* * * * *

(c) * * *

(2) Line seizure by automatic telephone dialing systems. Automatic telephone dialing systems which deliver a recorded message to the called party must release the called party's telephone line within 5 seconds of the time notification is transmitted to the system that the called party has hung up, to allow the called party's line to be used to make or receive other calls.

(3) Telephone facsimile machines; identification of the sender of the message. It shall be unlawful for any person within the United States to use a computer or other electronic device to send any message via a telephone facsimile machine unless such message clearly contains, in a margin at the top or bottom of each transmitted page or on the first page of the transmission, the date and time it is sent and an identification of the business, other entity, or individual sending the message and the telephone number of the sending machine or of such business, other entity, or individual. Telephone facsimile machines manufactured on and after December 20, 1992 must clearly mark such identifying information on each transmitted message.

**68 Fed. Reg. 44,144 (excerpt)**

**FEDERAL COMMUNICATIONS COMMISSION**

**47 CFR Parts 64 and 68**

[CG Docket No. 02-278, FCC 03-153]

**Rules and Regulations Implementing the Telephone Consumer Protection Act (TCPA) of 1991**

**AGENCY**: Federal Communications Commission.

**ACTION**: Final rule.

**SUMMARY**: In this document, we revise the current Telephone Consumer Protection Act of 1991 (TCPA) rules, and adopt new rules to provide consumers with several options for avoiding unwanted telephone solicitations. These new rules establish a national do-not-call registry, set a maximum rate on the number of abandoned calls, require telemarketers to transmit caller ID information, and modify the Commission's unsolicited facsimile advertising requirements.

**DATES**: Effective August 25, 2003, except for § 64.1200(c)(2), which contains the national do-not-call rules, and will become effective on October 1, 2003; § 64.1200(a)(5) and (a)(6), which contain the call abandonment rules, and will become effective on October 1, 2003; § 64.1601(e), which contains the caller ID rules, and will become effective on January 29, 2004; and §§ 64.1200(a)(3)(i), (d)(1), (d)(3), (d)(6), (f)(3), and (g)(1), which contain information collection requirements under the Paperwork Reduction Act (PRA) that have not been approved by the Office of Management and Budget. The Commission will publish a document in the **Federal Register** announcing the effective date for these sections. Written comments by the public on the new and modified information collections are due September 23, 2003.

**ADDRESSES**: In addition to filing comments with the Office of the Secretary, a copy of comments on the information collection(s) contained herein should be submitted to Leslie Smith, Federal Communications Commission, Room 1-A804, 445 12th Street SW., Washington, DC 20554, or via the Internet to *Leslie.Smith @fcc.gov*.

**FOR FURTHER INFORMATION CONTACT**: Erica H. McMahon or Richard D. Smith at 202-418-2512, Consumer & Governmental Affairs Bureau. For additional information concerning the information collection(s) contained in this document, contact Les Smith at 202-418-0217 or via the Internet at *Leslie.Smith@fcc.gov*.

**SUPPLEMENTARY INFORMATION**: This is a summary of the Commission's Report and Order (Order) in CG Docket No. 02-278, FCC 03-153, adopted on June 26, 2003 and released July 3, 2003. The full text of this document is available at the Commission's Web site (*http://www.fcc.gov*) on the Electronic Comment Filing System and for public inspection and copying during regular business hours in the FCC Reference Center, Room CY-A257, 445 12th Street, SW., Washington, DC 20554. The complete text may be purchased from the Commission's copy contractor, Qualex International, 445 12th Street, SW., Room CY-B402, Washington, DC 20554. To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an email to *fcc504@fcc.gov* or call the Consumer & Governmental Affairs Bureau at (202) 418-0531 (voice) or (202) 418-7365 (tty).

*Paperwork Reduction Act*: The Report and Order contains either new and/or modified information collections. The Commission, as part of its continuing effort to reduce paperwork burdens, invites the general public to comment on the information collection(s) contained in this Report and Order as required by the PRA. Public and agency comments are due September 23, 2003.

**Synopsis**

1. We revise the TCPA rules and adopt new rules to provide consumers with several options for avoiding unwanted telephone solicitations. Specifically, we establish with the Federal Trade Commission (FTC) a national do-not-call registry for consumers who wish to avoid unwanted telemarketing calls. The national do-not-call registry will supplement the current company-specific do-not-call rules for those consumers who wish to continue requesting that particular companies not call them. To address the more prevalent use of predictive dialers, we have determined that a telemarketer may abandon no more than three percent of calls answered by a person and must deliver a prerecorded identification message when abandoning a call. The new rules will also require all companies conducting telemarketing to transmit caller identification (caller ID) information, when available, and prohibit them from blocking such information. The Commission has revised its earlier determination that an established business relationship constitutes express invitation or permission to receive an unsolicited fax, and we have clarified when fax broadcasters are liable for the transmission of unlawful facsimile advertisements.

**National Do-Not-Call List**

2. *Section 227*. The TCPA requires the Commission to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object. In so doing, 47 U.S.C. 227(c)(1) directs the Commission to "compare and evaluate alternative methods and procedures" including the use of electronic databases and other alternatives in protecting such privacy rights. Pursuant to 47 U.S.C. 227(c)(3), the Commission "may require the establishment and operation of a single national database to compile a list of telephone numbers of residential subscribers who object to receiving telephone solicitations, and to make that compiled list and parts thereof available

for purchase." If the Commission determines that adoption of a national database is warranted, 47 U.S.C. 227(c)(3) enumerates a number of specific statutory requirements that must be satisfied. Additionally, 47 U.S.C. 227(c)(4) requires the Commission to consider the different needs of telemarketers operating on a local or regional basis and small businesses. In addition to our general authority over interstate communications, section 2(b) of the Communications Act specifically provides the Commission with the authority to apply section 227 to intrastate communications.

3. We conclude that the record compiled in this proceeding supports the establishment of a single national database of telephone numbers of residential subscribers who object to receiving telephone solicitations. Consistent with the mandate of Congress in the Do-Not-Call Implementation Act (Do-Not-Call Act), the national do-not-call rules that we establish in this order "maximize consistency" with those of the FTC. The record clearly demonstrates widespread consumer dissatisfaction with the effectiveness of the current rules and network technologies available to protect consumers from unwanted telephone solicitations. Indeed, many consumers believe that with the advent of such technologies as predictive dialers that the vices of telemarketing have become inherent, while its virtues remain accidental. We have compared and evaluated alternative methods to a national do-not-call list for protecting consumer privacy rights and conclude that these alternatives are costly and/or ineffective for both telemarketers and consumers. *See* 47 U.S.C. 227(c)(1)(A).

4. A national do-not-call registry that is supplemented by the amendments made to our existing rules will provide consumers with a variety of options for managing telemarketing calls. Consumers may now: (1) Place their number on the national do-not-call list; (2) continue to make do-not-call requests of individual companies on a case-by-case basis; and/or (3) register on the national list, but provide specific

companies with express permission to call them. Telemarketers may continue to call individuals who do not place their numbers on a do-not-call list and consumers with whom they have an established business relationship. We believe this result is consistent with Congress' directive in the TCPA that "[i]ndividuals" privacy rights, public safety interests, and commercial freedoms of speech and trade must be balanced in a way that protects the privacy of individuals and permits legitimate telemarketing practices." *See* TCPA, Section 2(9), *reprinted in* 7 FCC Rcd at 2744.

5. We agree with Congress that consistency in the underlying regulations and administration of the national do-not-call registry is essential to avoid consumer confusion and regulatory uncertainty in the telemarketing industry. In so doing, we emphasize that there will be one centralized national do-not-call database of telephone numbers. The FTC has set up and will maintain the national database, while both agencies will coordinate enforcement efforts pursuant to a forthcoming Memorandum of Understanding. The states will also play an important role in the enforcement of the do-not-call rules. The FTC has received funding approval from Congress to begin implementation of the national do-not-call registry. Because the FTC lacks jurisdiction over certain entities, including common carriers, banks, insurance companies, and airlines, those entities would be allowed to continue calling individuals on the FTC's list absent FCC action exercising our broad authority given by Congress over telemarketers. In addition, the FTC's jurisdiction does not extend to intrastate activities. Action by this Commission to adopt a national do-not-call list, as permitted by the TCPA, requires all commercial telemarketers to comply with the national do-not-call requirements, thereby providing more comprehensive protections to consumers and consistent treatment of telemarketers.

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system on February 19, 2019.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Eric A. Shumsky*

Eric A. Shumsky
*Counsel for Defendant-Appellant*